# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 4, 2014  Session

## STATE OF TENNESSEE v. RICKEY ALVIS BELL, JR.

**Appeal from the Circuit Court for Tipton County**
**No. 6664     Joe H. Walker, III, Judge**

_____

**No. W2012-02017-CCA-R3-DD  - Filed May 30, 2014**

_____

A Lauderdale County jury convicted the defendant, Rickey Alvis Bell, Jr., of felony murder in the perpetration of a kidnapping, felony murder in the perpetration of a rape, aggravated kidnapping, and aggravated sexual battery.  Following the penalty phase, the jury sentenced the defendant to death on the two counts of felony murder.  The trial court merged the two felony murder convictions and sentenced the defendant to twenty years each for the aggravated kidnapping and aggravated sexual battery convictions.  The trial court ordered the defendant to serve the two twenty-year sentences concurrent to each other but consecutive to the death sentence, for an effective sentence of death plus twenty years.  On appeal, the defendant asserts that: (1) the trial court erred in denying his motion to strike the State's notice of its intent to seek the death penalty because he is intellectually disabled; (2) the evidence is insufficient to support the convictions; (3) the trial court erred in denying his two motions for a mistrial; (4) the trial court erred in refusing to allow the defense to question the victim's husband regarding an extramarital affair; (5) the aggravating circumstance codified in Tennessee Code Annotated section 39-13-204(i)(7) is unconstitutional; (6) the absence of an intent to kill renders the death penalty disproportionate; (7) proportionality review should be modified and the pool of cases considered in proportionality review should be broadened; and (8) the sentence of death is arbitrary and disproportionate.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

James M. Gulley (at trial), Juni Samrat Ganguli (at trial and on appeal), and James Edward Thomas (on appeal), Memphis, Tennessee, for the appellant, Rickey Alvis Bell, Jr.

Robert E. Cooper, Jr., Attorney General & Reporter; Michelle Consiglio-Young, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr. and Joe Van Dyke, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant was convicted of two counts of felony murder and one count each of the aggravated kidnapping and aggravated sexual battery of the wife of his employer, Thomas R. Harris, Jr. ("Rick")[1]. During the evening hours of June 1, 2010, the victim's body was discovered by Nathan McKell in a wooded area behind the residence of Rick and the victim at Richardson Landing Lane in Drummonds, Tipton County, Tennessee.

Mr. McKell, Rick's stepson from a prior marriage, testified that he was fifteen years old in June 2010 and lived with Rick, the victim, Rick's children, and the victim's children. Mr. McKell also worked for Rick, who ran a business that performed landscaping and cleaning services on foreclosed houses. The employees gathered at Rick's house every morning, and Rick sent crews to various locations. While the crews were working, the victim remained at their home and completed paperwork on the computer. The computer was located in the front of the residence and to the left of the front door.

Mr. McKell testified that on June 1, 2010, he awoke at approximately 9:30 a.m. and that he, Johnny Parker, "Jose," James Arcutt, and Rick's two sons, Josh Harris ("Josh") and Ricky Adam Harris ("Ricky Adam"), gathered outside the residence to receive their assignments. Mr. McKell said he, Mr. Parker, and "Jose" began mowing the grass. At some point, Mr. Arcutt asked Mr. McKell to take him to Mr. Arcutt's house located around the corner so that he could retrieve his cigarettes. Mr. McKell drove Mr. Arcutt to his house on a four wheeler.

Mr. McKell said that in June 2010, the defendant lived in a house down the road from them. At 11:45 a.m., Mr. McKell saw the defendant walking down the driveway approximately 100 yards from Rick's house. The defendant was wearing black shorts, a black shirt, a black hat, and a chain. Mr. McKell said that shortly before noon, he overheard Rick and the defendant discussing the defendant's pay. The defendant asked Rick why his pay was short, and Rick responded that the defendant had missed a day of work. Mr. McKell explained that Rick paid his employees in cash based upon the number of days that they

---

[1] Because Thomas R. Harris, Jr. and some witnesses who testified at trial share the same last name, we will refer to them by their first names for purposes of clarity. By doing so, we intend no disrespect.

worked. Mr. McKell stated that the victim was in the area when the conversation occurred. Mr. McKell, Mr. Parker, and "Jose" then went to a house in Millington to mow a yard, while Rick worked with another crew.

Mr. McKell testified that he returned to his home at approximately 7:30 or 8:00 p.m. just as it was becoming dark. He assisted "Jose" in unhooking the trailer from the truck while Mr. Parker entered the residence. Mr. McKell then entered the residence and noticed that the computer was knocked back behind the desk and that the front door was open. Neither the victim nor the family's dogs were inside the house. Mr. McKell later found the dogs outside. He did not contact the police immediately. Rather, he contacted Rick and informed him of his observations.

Mr. McKell said he began looking around the house and noticed that the back door was open. He explained that the back door was not used often and believed that it was unusual that the back door was unlocked and open. He told Mr. Parker, who was in the living room, that the back door was open, and Mr. Parker called Rick to inform him. Mr. McKell and Mr. Parker then exited through the back door.

Mr. McKell stated that the back yard included an area of tall grass and a wooded area behind the grass. He noticed a path in the tall grass that was not there when he had left the house earlier in the day. Mr. McKell drove his four wheeler down a path into a heavily wooded area with hills, which made driving the four wheeler difficult. As a result, he flipped the four wheeler and was thrown off of it. When he got back on the four wheeler, he saw the lights shining on the victim's body, approximately twenty yards away.

On cross-examination, Mr. McKell testified that Mr. Arcutt was at his house when he awoke that morning. He was aware that Mr. Arcutt was dating "Katie," who also was "talking" to the defendant. The defendant and "Katie" had been involved for several weeks before June 1, 2010, and Mr. Arcutt was aware of it. Some of the employees teased Mr. Arcutt about the relationship. Mr. McKell said Mr. Arcutt did not like to be teased and did not like the defendant.

Mr. McKell said that at approximately 11:45 a.m. on June 1, he and Mr. Arcutt rode a four wheeler through the woods to Mr. Arcutt's house to retrieve Mr. Arcutt's cigarettes. They then rode the four wheeler down the road to Mr. McKell's house. Mr. Arcutt did not work that afternoon, and Mr. McKell did not know why Mr. Arcutt did not work.

Mr. McKell testified that he saw the defendant around noon on June 1 outside of Mr. McKell's home. Mr. McKell said Rick gave the defendant his pay as the defendant was standing in the doorway inside the home. Mr. McKell saw the defendant again as Mr.

McKell was walking back outside and going to work. He did not see the defendant for the rest of the day. Mr. McKell did not speak to Rick from noon until 8:00 p.m. He believed Mr. Parker may have talked to Rick.

When Mr. McKell arrived home from work, he observed that the lights were on inside the home and that the front door was open. After Mr. Parker entered the house, he did not call out for Mr. McKell and "Jose" to enter. Mr. McKell testified that when he called Rick to report his observations, Rick was "calm" but suspected that something was wrong. Rick instructed Mr. McKell to call out for the victim and try to find her. Rick also told him to look outside. Mr. McKell looked around the yard and called Rick when he noticed that the grass had been laid down in a path. Rick instructed him to look in the woods. Mr. McKell said he searched for the victim in the woods for approximately thirty minutes before he found the victim's body. He stated that the only other people who went into the woods were Kelly Phelps, Dustin Perdue, and Mr. Parker. Other people came to the residence. Mr. McKell did not recall seeing Mr. Arcutt at the scene.

Belinda Joyce Bell, the defendant's mother, testified that in June 2010, she and her three sons lived on Richardson Landing Road in Drummonds. She was employed in the food service department at the West Tennessee State Penitentiary. She said that on June 1, 2010, she worked from 5:00 a.m. to 1:00 p.m. and arrived home at approximately 2:00 p.m.

Ms. Bell said that upon arriving home from work, she spoke to the defendant who was sitting on the couch. The defendant was wearing a white T-shirt, blue short pants, and white socks. He was not wearing any shoes. Ms. Bell stated that the defendant had not been home when she left for work at 4:00 a.m. Rather, he was at his girlfriend's home. Ms. Bell said the defendant had called her the previous day and told her that he was not coming home that day.

Ms. Bell said that after speaking to the defendant, she showered. She also said that as far as she knew, the washing machine was not running at that time. She explained that her shower lost pressure whenever her washing machine was operating.

Ms. Bell testified that the defendant worked for Rick and was paid in cash. She did not know whether the defendant had missed one day of work during the week before May 31, 2010, Memorial Day. Two weeks before Memorial Day, Ms. Bell drove the defendant to the doctor. The defendant did not mention to Ms. Bell whether he would be paid for the day that he missed work.

Ms. Bell testified that officers arrived at her home on June 1st at approximately 8:45 p.m. She said the officers handcuffed the defendant and escorted him outside. Another

officer later instructed the officers to remove the handcuffs. On June 9th, the defendant was arrested at his girlfriend's residence. Ms. Bell said the officers seized several items from her home, including her work shoes, the defendant's clothes, her clothes, the clothes of her son, Kevin, towels, and condoms. Ms. Bell did not know to whom the condoms belonged. She said the defendant slept on the couch in the den and used a closet in the room of one of her other sons.

Ms. Bell recalled that law enforcement came to her home on another occasion and showed her a photograph of what she believed to have been a gun. She informed officers that her son, Kevin, had a gun similar to the one depicted in the photograph but that the gun had been stolen the previous year.

On cross-examination, Ms. Bell testified that the defendant did not work on Memorial Day and was at home. The defendant generally was paid on Mondays. He informed Ms. Bell that he would not be home on Tuesday because he expected to be paid on Memorial Day. However, the defendant was not paid as he expected.

Ms. Bell did not recall whether the washer was operating when she returned home from work on June 1st. After she returned home from work, she did not see the defendant wash any laundry. Ms. Bell said the defendant left her home at approximately 3:30 or 4:00 p.m. He took her car to purchase gas and a package of cigarettes. While the defendant was gone, she received a call from her son, Michael, requesting that she allow the defendant to pick him up and drive him to another location. Ms. Bell then called the defendant and told him of the conversation. The defendant returned at approximately 8:30 or 9:00 p.m. and approximately twenty-five minutes before officers arrived.

Ms. Bell testified that approximately twelve or thirteen officers came to her residence on June 1st and remained until around midnight. The officers knocked on her door, and she invited them inside. The officers did not have a warrant. They asked to speak to the defendant. Ms. Bell said that at the time, she did not know why the officers were there. The officers asked the defendant to step outside, and he complied with the request. Ms. Bell said the officers took items from her home and questioned her for approximately thirty minutes.

Tommy Redditt, who lived on Richardson Landing Lane, testified that he had taken a week's vacation during the week of June 1, 2010. While outside grilling at approximately 1:00 p.m. on June 1st, Tommy saw an African-American man walking down Richardson Landing Lane. Tommy recognized the man as one of Rick Harris' employees and knew that the man lived in the area.

Tommy testified that he saw the man again at approximately 1:30 p.m. on the same

day. The man was standing near a "goose neck" trailer and was looking around and back toward Rick's house. The man was wearing the same clothing that he had been wearing when Tommy first saw him. Tommy said the man's actions seemed unusual, and he did not know whether the man was waiting for Rick or one of the other employees to return for him.

Tommy testified that later that evening at approximately 8:00 p.m., his son, Tommy Redditt, Jr., a first responder, called and said that someone had been murdered or found dead behind Rick's house. Tommy, Jr. asked Tommy to go to Rick's house and check on the victim. Tommy said the distance between his front porch and Rick's house was 150 to 200 yards. Tommy went to the home but did not enter it. He saw some of Rick's employees standing outside beside the home. They informed Tommy that the body was the victim and that she might have a pulse. Tommy stated that one of Rick's step-children was there and was an "emotional wreck" because he had found the victim.

Tommy said he and Tommy, Jr. went into the woods to see the victim's body. They used flashlights to find their way. Several people were with the victim's body when they arrived. The first responders had not yet arrived. Tommy stated that he did not recognize the victim at first and that she had what appeared to be a great amount of blood on her. He also saw a four-wheeler with its headlight on in the general area.

On cross-examination, Tommy testified that while he was grilling, his son, Andrew, was playing basketball a few hundred feet away. Tommy acknowledged that his attention was on grilling and watching his son. He did not see the man walk directly to the victim's home. He did not keep a close watch on the man because he recognized the man as one of Rick's employees.

Tommy said that while he was grilling, he was in and out of his house. He remained inside his home for no more than three minutes at a time. He never saw two men drive up to the victim's home in a truck. He did not see the postman at any time during that afternoon and did not see a Federal Express truck on Richardson Landing Lane. Tommy stated he entered his home at approximately 1:30 p.m. and remained inside for the remainder of the day.

Andrew Michael Redditt, Tommy's son, testified that on June 1, 2010, at approximately 12:40 or 12:50 p.m., he went outside and played basketball on Rick's basketball court. His father, Tommy, was outside grilling. After Andrew had been playing basketball for ten to fifteen minutes, the defendant approached him and asked where "Little Josh" was. Andrew assumed that the defendant was referring to Josh Harris. Andrew said the defendant was wearing black shorts and a black T-shirt. He did not know where the defendant lived or worked.

Andrew testified that after speaking to the defendant, the defendant began to leave, walking down the gravel road. The defendant then stopped for a moment and began walking toward Rick's house. Andrew said the defendant knocked on the door. Andrew saw the victim come to the door and speak to the defendant for approximately ten seconds. He stated he then saw the defendant enter the home. Andrew continued playing basketball and then returned home where his father was preparing their lunch.

On cross-examination, Andrew testified that while he was playing basketball, his father was behind their home grilling. Andrew said that there was quite a bit of distance from his home to the basketball court and that he did not recall whether there was junk or garbage near the basketball court. He stated that he could walk from the gravel road to the basketball court in approximately ten seconds and from the basketball court to Rick's home in approximately fifteen seconds.

Andrew testified that he was certain that he saw the defendant enter Rick's home. He did not see the victim step outside of the home when the defendant arrived but saw the victim answer the door.

Andrew said he continued to play basketball for approximately ten more minutes. He did not see a truck pull into Rick's driveway. He did not see a Caucasian man and another man drive up in a truck and the Caucasian man speaking to the victim for approximately ten minutes. While eating inside his home, Andrew did not see a Federal Expresss truck in the area.

Carol Redditt, Tommy's wife and Andrew's mother, testified that between 1:00 and 1:10 p.m. on June 1, 2010, she was in her back yard with her husband grilling. Mrs. Redditt saw the defendant walking down Richardson Landing Lane toward Rick's house. He was wearing all black and had a black "do-rag" on his head. Mrs. Redditt said she had seen the defendant several times before in connection with Rick's lawn care service. She did not see the defendant do anything but walk in the direction of Rick's home.

Mrs. Redditt testified that at approximately 8:30 p.m. that evening, she heard screaming and yelling coming from down the street and walked down the road to investigate. Upon arriving at Rick's home, she learned that a body had been found behind the home but did not know who it was. Once she learned that it was the victim who had been found, she walked around to the back of the house where she met Mr. McKell. Mr. McKell was talking to a 9-1-1 operator over the telephone. He handed Mrs. Redditt the telephone, asked her to talk to the operator, and ran back toward the location of the victim's body. Mrs. Redditt remained on the telephone for approximately forty-five seconds and then walked toward the area of the victim's body. At that time, she did not know whether the victim was still alive.

Mrs. Redditt said she walked partially down a hill in the woods where the victim was and saw her husband, Tommy, Jr., and two other people. Mrs. Redditt knew that the victim was lying in the area but could not see any details. Tommy instructed her to not go any further. Mrs. Redditt saw a four-wheeler. The headlights were on but were at an angle so that she could not see the victim's body. Mrs. Redditt denied touching the victim's body. She then returned to the front of the home and was there when law enforcement arrived. Rick arrived six to seven minutes after Mrs. Redditt arrived.

On cross-examination, Mrs. Redditt testified that she went to the victim's house, along with her husband, to sit with the victim. Mrs. Redditt said she had been friends with the victim for a little more than one year. When she first arrived, she only saw Thomas Harris, Rick's father, standing in front of the house. She saw Dustin Perdue, Kelly Phelps, her husband, and her son standing next to the victim's body. As Mrs. Redditt was standing in the woods, a law enforcement officer and two emergency medical technicians walked past her. Everyone then walked back to the home. By the time they returned, law enforcement officers were everywhere.

Mrs. Redditt said that in June 2010, garbage and debris, including an abandoned truck, were piled near Rick's home. Garbage was piled between her home and the basketball court. Mrs. Redditt did not recall seeing a truck drive from Richardson Landing Lane to the Harris home earlier that day.

Alexia Block, a friend of the victim, testified that on June 1, 2010, she and the victim exchanged text messages. The series of text messages began at 1:02 p.m. and twenty-seven seconds and continued until 1:28 p.m. and three seconds. The last text message that Ms. Block received from the victim was at 1:25 p.m. At 1:28 p.m., Ms. Block sent the victim a text message that stated that she hoped that the victim's day improved and that she loved her. Ms. Block said that the victim generally responded that she loved Ms. Block too; however, the victim never responded to the text message.

Gregory Plunk, who delivered packages for Federal Expresss Ground, testified that on June 1, 2010, he delivered a package to Rick's home. He went to one of the houses on Richardson Landing Lane and spoke to an older man who was in the yard. Mr. Plunk told the man that he had a package for Thomas Harris. The man said the package was probably for his son and directed Mr. Plunk to Rick's house at the end of the lane. The man told Mr. Plunk that someone likely was there and that if no one was there, he would sign for the package. Mr. Plunk said he delivered the package at 2:16 p.m.

Mr. Plunk saw a vehicle was in the driveway, so he assumed that someone was there. He knocked on the door, but no one came to the door. The inside and outside doors were

closed, and Mr. Plunk did not hear any noise from inside the house. He scanned the delivery notice and left.

Kevin Sisco testified that in June 2010, he and his wife, Brittany, lived on Richardson Landing Lane and that he worked for Rick Harris. At that time, Mr. Sisco was the supervisor over the landscaping crew, while the defendant was on the debris crew. The employees generally met at Rick's home to receive their orders for the day. The employees were paid in cash and were not paid for days that they were absent. Mr. Sisco stated all employees understood that they would not be paid if they were absent from work for any reason. He also stated that the topic was discussed at work on a daily basis. He recalled the defendant stating that he had a doctor's appointment one day.

Mr. Sisco said he saw the defendant on Tuesday, June 1, 2010, when the defendant came to Rick's home to be paid. Rick Adam Harris gave the defendant his wages while they were standing outside. On that day, Mr. Sisco was mowing the entire property at Richardson Landing Lane. He said he left Rick's house at 10:00 a.m. or 11:00 a.m. and saw the defendant standing outside of the defendant's front door. Mr. Sisco waved at the defendant, and the defendant waved in return. Mr. Sisco said he was driving a white Chevrolet box truck, which everyone recognized as the only truck that he drove unless he was working on the debris crew.

Mr. Sisco stated that while he was working on another yard, Mrs. Sisco called him and said that the defendant had dropped by and asked for him. Mr. Sisco believed this was strange because he had seen the defendant as he was leaving. Mr. Sisco normally parked the truck that he was driving in his driveway when he was at home.

Mr. Sisco testified that while he was on his way home from work, Rick Adam Harris called him and told him about the victim. When he returned home, Mrs. Sisco told him that the victim was found in the woods, and she wanted to go to Rick's home to see whether they needed to help Kelly Phelps and Dustin Perdue. They walked into the woods where the victim's body was located. When they arrived, only Ms. Phelps and Mr. Perdue were there. Mr. Sisco denied that he and his wife touched the victim's body. They then returned to Rick's yard, and Rick arrived approximately twenty minutes after they arrived.

Mr. Sisco testified regarding a route that existed from the approximate location of the victim's body and Rick's home that could have been taken to avoid detection. Mr. Sisco said he took that route while fleeing from law enforcement officers in December 2010. He ran through the woods to the other side of Richardson Landing Road and near the defendant's house. Mr. Sisco said a person could run the route in approximately fifteen to thirty seconds.

-9-

On cross-examination, Mr. Sisco testified that he had prior convictions for evading arrest, aggravated burglary, and vandalism of property valued more than $500. The episode in December of 2010 during which he ran from law enforcement officers was an incident separate from the convictions.

Mr. Sisco said that Rick never paid him on time and that he grew tired of it. He was not absolutely certain that Rick gave the defendant's wages to Rick Adam to give to the defendant. Mr. Sisco said he was with Hunter Fleming when he waved at the defendant. The defendant was several feet away, and Mr. Sisco did not recall how fast he was driving.

Brittany Sisco, Mr. Sisco's wife, testified that in June 2010, she was nine months pregnant and unemployed. She knew the defendant because he lived in the neighborhood and worked for Rick Harris. On the morning of June 1st, while on her front porch, Mrs. Sisco saw the defendant in Rick's yard with the other employees who were gathering before going to job sites.

Mrs. Sisco said that after Mr. Sisco left, she went grocery shopping with her mother and returned at approximately 1:00 p.m. The defendant knocked on her front door as she was putting the groceries away. Mrs. Sisco came to the door, and the defendant asked for Mr. Sisco. She told the defendant that Mr. Sisco was at work, and the defendant replied, "Dang, they were just here." Mrs. Sisco gave Mr. Sisco's cellular number to the defendant. After the defendant left, she called Mr. Sisco and told him that the defendant should be calling him.

Mrs. Sisco testified that after the defendant left, he called their home telephone four or five times. The defendant's telephone number appeared on her "Caller ID." She answered the first and second call from the defendant. She never received a response when she answered. She said "hello" several times, and no one responded. Mrs. Sisco said she heard wind or breathing on the other end when she answered the calls. She began ignoring the defendant's calls after she did not receive a response. She stated she was not having problems with her telephone that day.

Mrs. Sisco stated that at 6:00 p.m. or 7:00 p.m., Rick Adam called her and told her that they could not get in touch with the victim. He asked whether she had seen or heard from the victim, and Mrs. Sisco said she had not. She then looked outside and saw Johnny Parker's work truck parked at Rick's house. She called Mr. Sisco and asked whether he knew what had happened. He said he did not. While they were talking, Rick Adam called Mr. Sisco. When Mrs. Sisco hung up, she went to Rick's house to help search for the victim. Mr. McKell, Mr. Parker, and "Jose" were there when she arrived. She walked into the house and saw that the computer was knocked over. By that time, Mr. Parker had called the police. She then went outside on the front porch.

Mrs. Sisco testified that Mr. McKell said he was going to ride his four-wheeler and search for the victim. Mr. Parker told Mr. McKell to not go into the woods, but Mr. McKell did so anyway. Mrs. Sisco said that approximately thirty seconds later, she heard Mr. McKell screaming, "Oh, my God, [she] is dead. [She] is dead."

Mrs. Sisco said she returned to her home later that evening. Mr. Sisco arrived thirty to forty minutes after Mr. McKell discovered the victim's body. Mr. and Mrs. Sisco walked into the woods to search for the victim. The grass was so tall that Mrs. Sisco could see the trail that Mr. McKell had made. The four wheeler was flipped over, and its lights were still on.

Mrs. Sisco stated that she saw the victim's body. When she and her husband approached the victim, Ms. Phelps and Mr. Perdue were the only other people around. As Mr. and Mrs. Sisco were returning from the woods, they saw Rick and the police officers. The officers stopped Rick as he was walking down the hill to the victim's body. The officers led Mrs. Sisco back up the hill and said she did not need to be down there.

On cross-examination, Mrs. Sisco testified that in June 2010, Mr. Sisco and Kevin Bell, the defendant's brother, spoke regularly about Mr. Bell selling his Grand Marquis to Mr. Sisco. She said the defendant could have continued to dial her number accidentally.

Kelly Phelps, Rick Harris' business partner, testified that she and Rick performed landscaping and property preservation tasks on foreclosed homes. They generally employed ten to twenty workers at a time depending upon the amount of work they had to complete. They sent multiple crews of three to four people to different sites. In June 2010, Rick was responsible for the lawn and debris work, while Ms. Phelps supervised the cleaning crews.

Ms. Phelps said the victim assisted them by uploading photographs of projects they had completed. She also responded to emails and telephone calls. The victim operated in a dining area in the front of her home just inside the front door. The crews responsible for lawn care and debris met every morning at Rick's house before reporting to job sites.

Ms. Phelps stated that on June 1, 2010, she called Rick at his home at approximately 8:30 a.m. Both Rick and the victim had cellular telephones. Ms. Phelps, however, called their home telephone because they did not have cellular service in that area. Ms. Phelps said that once she and Rick completed their work at a property, they called to update each other. At one point that day, Rick told her that he was at Munford Tire and Brake. She communicated with the victim in a similar fashion.

Ms. Phelps testified that on June 1st, she talked to the victim on the victim's home

telephone four or five times to update her. She last spoke to the victim shortly before 1:00 p.m. She called the victim at 2:30 p.m., but the victim did not answer. She called the victim multiple times and sent multiple text messages to the victim, but the victim did not respond.

Ms. Phelps said that on June 1st, she and Dustin Phelps worked at multiple locations, including Brownsville and Cordova, Tennessee. They ended the day in Mississippi. Ms. Phelps said she spoke to Rick over the telephone at times throughout the day. She last spoke to him at approximately 6:30 p.m. when she was driving back from Mississippi and he was in Collierville.

Ms. Phelps testified that the victim's daughter, Brenna, cared for her children while she was working. Ms. Phelps was at her desk at 7:00 or 7:30 p.m. that evening when she heard Brenna answer her telephone. Rick had called Brenna and asked her whether she had talked to the victim, and Brenna said that she had not. At the same time, Ms. Phelps called the victim at her home to update her. Mr. McKell answered the telephone and told her that something was wrong. He said that the victim's desk and chair were toppled over and that the back door was open. After Ms. Phelps spoke to Mr. McKell, Rick called her and asked whether she had spoken to the victim. He asked her to go to his house and said he was in Collierville, Tennessee. Ms. Phelps lived five to ten miles away from Rick's home.

Ms. Phelps testified that she and Mr. Perdue drove Brenna to her father's house and then went to Rick's house. When they pulled into the driveway, Mr. McKell was screaming that he had found the victim. Johnny Parker was on the porch with Mr. McKell and was trying to hold him. Ms. Phelps and Mr. Perdue ran into the woods. Mr. McKell had told them that he had turned over the four-wheeler and that the lights were shining on her. They were able to find the victim's body.

Ms. Phelps said that blood was on the victim's face, that her shirt was ripped open, and that her bra was pulled down to her waist. She also said that something was wrong with the back of the victim's head and that her eye was damaged badly. Mr. Perdue told Ms. Phelps that he did not want her to come toward the victim's head, so she sat near the victim's knees. Mr. Perdue touched the victim to determine whether she had a pulse and said he believed he felt a pulse. Ms. Phelps laid her hands on the victim's body and cried. Mr. Perdue said he needed to insure that someone had called the police and left Ms. Phelps with the victim.

Ms. Phelps testified that she attempted to cover the victim's body because she did not want people to see the victim exposed. She denied moving the victim. She did not leave the victim until police officers arrived and made her leave. The paramedics arrived before the police. Ms. Phelps said the first responder was unable to feel a pulse. The paramedics then

hooked the victim up to an electronic machine and said they believed they detected something. They then determined that they were wrong.

Ms. Phelps recalled that as she was leaving, she saw Kevin and Brittany Sisco walking down the hill and toward the victim. She told them to stop because she did not believe that Mrs. Sisco, who was pregnant, needed to see the victim's body. Ms. Phelps walked to the top of the hill just as Rick Harris arrived and said that he was in "absolute terror." Officers stopped Rick from going to see the victim's body.

Ms. Phelps stated she then entered Rick's home. The victim's computer desk was a corner desk with a cabinet on top of it. The cabinet, the printer, and the computer monitor were pushed over. The victim's chair was on its back.

On cross-examination, Ms. Phelps reviewed telephone records. According to the records, she did not speak to Rick on his cell phone between 1:30 p.m. and 2:21 p.m. on June 1, 2010.

Ray "Tank" Horne testified that on June 1, 2010, he and the defendant were employed by Rick Harris. He and the defendant worked in the same crew on some days. Everyone was paid in cash only for those days in which they worked. Mr. Horne believed that everyone, including the defendant, was aware of this policy.

Mr. Horne said he saw Rick Adam Harris pay the defendant on the morning of June 1st at Rick's house before they left for work. Mr. Horne also said that upon receiving his money, the defendant counted it. The defendant asked Mr. Horne why his money was "short," and Mr. Horne reminded him that he had missed one day of work.

Mr. Horne testified that he, Rick, and Rick Adam loaded up the dump truck and went to Munford Tire to purchase new tires. They arrived at approximately 11:00 a.m. or noon. Mr. Horne said they may have taken two trucks to Munford Tire. They remained there for some time because the mechanics had difficulty removing one of the tires. Mr. Horne said Josh joined them after they arrived. While the truck was being repaired, they remained in the waiting area and checked on the progress periodically. Mr. Horne, Rick, Rick Adam, and Josh then went to lunch at a Chinese restaurant located next to Munford Tire. The repairs were completed shortly after they returned from lunch. All four of them then left in the truck.

Mr. Horne said they cleaned four houses in Shelby County that day. While they were at the fourth house, a woman approached and wanted them to cut her hedges. They drove to her house to look at them and give her an estimate. While Rick was outside talking to the

woman, Mr. Horne, Rick Adam, and Josh remained inside the truck. Either Mr. McKell or Mr. Parker called, and Josh answered the telephone. Josh learned that Rick's house appeared as if someone had been in there. When Rick returned to the truck, he learned what had occurred. Mr. Horne said that Rick began calling the victim but that the victim did not answer. They left and drove back to Rick's house, arriving thirty to forty minutes later.

Mr. Horne said that when they arrived at Rick's house, rescue personnel, fire fighters, and police officers were there. Mr. Horne denied walking down into the woods to see the victim's body. They attempted to keep Rick away but were unable to do so. Mr. Horne was not sure whether Rick went into the woods and saw the victim's body.

On cross-examination, Mr. Horne testified that he quit working for Rick because the money that he was paid was not worth the work that he was doing. He said he first saw the defendant at Rick's house at 9:00 a.m. or 10:00 a.m. Rick Adam paid the defendant while Rick was inside sleeping. The defendant then counted his money. Once the defendant realized the money was less than he normally made, he began to question others why this would have happened. Mr. Horne reminded the defendant that he had missed work one day. He did not recall the defendant telling him that his pay had already been deducted for the day that he was absent. The defendant continued to ask to speak to Rick, but Rick did not come outside. Mr. Horne did not know what time that Rick woke up and came outside.

Mr. Horne clarified that they drove only one truck to Munford Tire and that they took a tire from a Yukon to be worked on. Munford Tire was located "a couple of minutes" away from Rick's home and was busy that day. Mr. Horne stated Rick was with them the entire time that they were at Munford Tire. He was not sure what time that they left Munford Tire.

Rick Adam Harris, Rick Harris' son, testified that in June 2010, he was seventeen years old and living with his father. Rick Adam said the employees would meet at his home to receive their orders for the day. Rick would instruct Rick Adam what tasks needed to be completed that morning before going to the job sites. Rick Adam then would instruct the employees, who would complete the tasks. He stated the employees were paid in cash and were not paid for those days in which the employees were absent. He also stated that this policy was known among all of the employees. He testified that on June 1, 2010, he gave the defendant his wages from the previous week. The defendant then spoke to Mr. Horne about whether Rick would allow him to return to work.

Rick Adam said that on June 1st, he, Rick, and Mr. Horne were assigned to clean out foreclosed homes. They left together in a dump truck. They first went to Munford Tire to have the tires on the dump truck repaired. The repairs took longer than expected because the tires on the studs were broken. After waiting for approximately one hour at Munford Tire,

Josh Harris arrived at 11:00 or 11:30 a.m. Josh had walked from Munford High School where he had basketball practice to Munford Tire so that he could work with the crew for the remainder of the day. While the tire was being repaired, Rick, Rick Adam, Josh and Mr. Horne went to a Chinese restaurant located next to Munford Tire and ate lunch.

Rick Adam testified that while they were walking back to Munford Tire from the restaurant, Rick received a call regarding the defendant's pay. While taking the call, Rick asked Rick Adam the amount that the defendant had been paid. Rick Adam told him $300, and Rick said that was the correct amount.

Rick Adam said they waited another forty-five minutes to one hour for the tire to be repaired. After the tire was repaired, Rick, Rick Adam, Josh, and Mr. Horne went to Shelby County where they cleaned three houses and yards. As they were preparing to return home, Rick Adam received a call from Mr. McKell, who said that he was unable to contact Rick. At the time, Rick was speaking with a woman about cutting her grass. Mr. McKell told Rick Adam that he had arrived home to discover that the computer was turned over and the back door was open. Rick told Rick Adam to instruct Mr. McKell to look for the victim and call her friends to see whether they had been in contact with her.

Rick Adam testified that while they were going home, Mr. McKell called Rick and said he drove his four wheeler into the woods and found the victim. Mr. McKell said the victim was not breathing. They drove home as fast as they could. When they arrived, Rick took off running, while Rick Adam ran inside the house. Rick Adam did not go into the woods to see the victim's body. When law enforcement officers arrived, they made everyone leave the house and placed crime scene tape around the area.

On cross-examination, Rick Adam testified that the defendant counted his money in front of him but never said anything to him about his pay being less than it generally was. The defendant did not ask to speak to Rick about why his pay was less. Rick Adam said Rick was with him during the entire time that they were at Munford Tire. He denied that Rick told him to instruct Mr. McKell to look for the victim in the woods.

Logan Tate, a manager at Munford Tire, testified that on June 1, 2010, Rick Harris and a crew of men came to Munford Tire before lunch. Mr. Tate recognized Rick as a customer and said that he had performed maintenance work on all of Rick's vehicles. Mr. Tate said he had to send someone to Memphis to retrieve parts to repair Rick's vehicle. He saw Rick during the course of working on his vehicle. Rick had customers waiting and wanted Mr. Tate to hurry. At one point, Rick and his crew went to the Chinese restaurant located next to Munford Tire.

On cross-examination, Mr. Tate testified that he did not know the exact time of Rick's arrival. He said that the shop generally has approximately one hundred customers each day and that they were busy that day. He prepared a handwritten receipt of the charges for the repairs and gave it to Rick.

Rick Harris testified that on June 1, 2010, he and the victim had been married for almost three years and that they lived together for three to three and one-half years before they married. Rick and his partner, Kelly Phelps, owned a business where they performed property preservation work on foreclosed homes. At the time, Rick had two crews who mowed grass and one crew who completed property maintenance tasks and cleaned the houses. Rick also worked on the crews. Ms. Phelps was responsible for the cleaning side of the business. Once the debris was removed and the lawn was mowed, she performed the final cleaning in the house. Rick paid his employees in cash. He said the employees were not paid on days in which they were absent.

Rick stated that he and Ms. Phelps were paid for the jobs after the victim uploaded photographs of the work performed and prepared the invoices. The victim performed this work in the front room of their home. Rick had a land line at his home due to poor cellular reception and maintained a cellular telephone while he was on a job site. While on a job site, he called the victim on the land line and Ms. Phelps on her cellular telephone throughout the day.

Rick testified that on Monday night, Memorial Day, he and the victim played cards at Rob Chaney's house and returned home in the early morning hours of June 1st. On June 1st, the work crews arrived at Rick's home at 7:00 a.m. Rick explained that he received his jobs through email. Because his internet was down, he was not able to assign jobs to his crews. Rather, he instructed them to perform yard work on his property.

Rick said he did not see the defendant on the morning of June 1st because Rick was either still in bed or lying on his couch. Rick gave Rick Adam $300.00 to give to the defendant.

Rick stated he was on a work crew on June 1st with Rick Adam and Mr. Horne. Due to a problem with one of the tires on his truck, they first stopped at Munford Tire, arriving at approximately noon. The staff at Munford Tire had issues with one of the lug nuts on the tire and were unable to place the tire onto the truck. Josh Harris met the crew at Munford Tire following basketball practice. Rick said they waited at Munford Tire for forty-five minutes to one hour before going to lunch.

Rick testified that at approximately 1:10 p.m., the victim called his cellular telephone

-16-

from the land line at their home. The call lasted for approximately one minute. The victim told Rick that the defendant was at their home and wanted to speak to him. Rick told her to give the telephone to the defendant. Rick said the reception on their wireless telephone with the land line number was forty to fifty feet from the front door. The defendant asked Rick why his wages were $50.00 less than they usually were. Rick did not know whether someone had explained to the defendant the reason that his wages were less that week. He told the defendant, "Don't you remember you missed a day last week when you went to the doctor or something?" The defendant replied, "Oh, okay." Rick told the defendant to be ready to work the following morning. Rick did not believe that any problem existed between him and the defendant.

Rick stated that approximately fifteen minutes later, he, Rick Adam, and Mr. Horne walked to the Chinese restaurant located next to Munford Tire to eat lunch. Rick did not recall whether Josh had joined them yet. The staff at Munford Tire were unable to locate a part to repair the tire. As a result, they told Rick to return when they received the part. Rick, Rick Adam, Mr. Horne and Josh left Munford Tire at approximately 4:00 p.m. They went to four houses in Shelby County where they tended to the lawns and hedges.

Rick testified that while they were at the fourth location, he called his land line number because he had not spoken to the victim in some time. The victim did not answer. A short time later, Mr. McKell called Rick and said that the computer was knocked over and that the victim was not there. Rick instructed Mr. McKeall and his crew to search the house. They called Rick and said that the back door was open and that there was a path in the grass. Rick explained that the back door was never used because it had a dead bolt on it. He instructed them to search outside. The men called him again and said that they could not see anything in the dark and that they were going to borrow flashlights from Rick's father. While Rick was driving home, Mr. McKell called him and said that the victim was dead. Rick was still in Shelby County when he received the news.

Rick said that when he arrived home, he parked his truck and took off running. He attempted to run down to the location of the victim's body, but an officer stopped him. He said he last saw the victim when she left their home to go to Munford Tire and last spoke to her at 1:10 p.m.

On cross-examination, Rick denied that he and the victim argued while at Mr. Chaney's house on Memorial Day. When they returned home that morning, they engaged in sexual intercourse and went to sleep. Rick said he awoke at 7:00 a.m. on June 1st and learned that the internet was down. He got out of bed at 10:00 a.m. He then spoke to Rick Adam and understood that the defendant was there for his wages.

Rick said when he awoke that morning, he was told that one of the tires on his Yukon was damaged. He instructed the employees to plug the tire, but they were unable to do so. He said he did not remove the tire and take it with him to Munford Tire. He also said they drove one vehicle to Munford Tire, which was located eight to ten miles from his home.

Rick denied killing the victim and placing her body in the woods. He said he regretted not calling and checking on the victim earlier in the day but said he was too busy working. He acknowledged that during the course of the afternoon, he sent five text messages to Rebecca Harris and that the text messages were not related to work.

Rick stated he called Ms. Harris during the trial and discussed hairs that were found on the victim. He told her that the hairs likely were his. Rick testified that he and the victim had engaged in sexual intercourse and that the victim had not taken a shower. He said that when he left his home that morning, the victim was wearing the same clothes that she had been wearing the previous night. He did not know whether the victim took a shower after he left his home that morning. He denied instructing Ms. Harris on how to testify and said he only told her to testify regarding what she knew.

Rick testified that he did not have any life insurance on the victim. His sister applied on his behalf for a lump sum settlement from the Social Security Administration in December of 2010, and he received a small amount of money.

Special Agent John Sullivan, a criminal investigator assigned to the Field Unit of the Tennessee Bureau of Investigation, testified that he received a call from his supervisor to report to the crime scene on June 1st at approximately 9:30 p.m. He contacted Chief Deputy Donna Turner with the Tipton County Sheriff's Office and advised her that he was en route to the scene. He arrived at the scene at approximately 11:00 p.m. Many officers were already at the scene, a modular home located at the end of the street. He observed crime scene tape around the front yard. He also observed a pile of scrap metal, old lawn mowers, miscellaneous junk in the yard, and a flat-bed, "goose-neck" trailer for a "dully style" truck.

Special Agent Sullivan said Chief Deputy Turner escorted him to the victim's body. He observed a path in the back yard through the tall grass where the grass had been pushed down. He said it appeared as if people had recently walked through the area. The grass was still green, and he believed the grass would have been dead and brown had the path been old.

Special Agent Sullivan testified that the victim's body was located in a densely wooded area with many hills. He said that it was difficult to walk in the area in the dark and that he had to use a flashlight to see. The victim's body was located approximately one hundred yards into the woods, and two deputies were stationed by the body. The two

deputies turned off their flashlights to keep from attracting bugs. When Chief Deputy Turner yelled for the deputies, they yelled back and turned on their flashlights to enable Chief Deputy Turner and Special Agent Sullivan to find them. Special Agent Sullivan noted that the victim was not wearing shoes and that walking through the terrain without shoes would have been difficult.

Special Agent Sullivan stated he next went inside the residence. He observed that a disturbance appeared to have occurred near the computer desk. The back door was open.

On June 2nd, Special Agent Sullivan, Detective Richard Nessley, and other deputies with the Tipton County Sheriff's Office visited the home of Belinda Bell. After obtaining consent from both Ms. Bell and the defendant, the officers searched the home and recovered shoes and other evidence. Special Agent Sullivan saw but did not collect an empty Magnum condom wrapper and a necklace with a metal medallion in the shape of a marijuana leaf.

Special Agent Sullivan said that on June 8, 2010, he met with Ms. Bell and showed her a photograph of a lighter in the shape of a handgun that was recovered in the woods. He asked Ms. Bell whether she had seen the item in her residence, and she said that she had. Ms. Bell then signed the photograph.

Special Agent Sullivan testified that he spoke to Rick Harris on multiple occasions. Special Agent Sullivan agreed that the spouse is often the initial person of interest. Rick was visually examined, and photographs were taken of his hands, legs, and back. Special Agent Sullivan observed scratches on Rick's hand and left forearm. He knew that Rick mowed yards, maintained homes, and performed manual labor. Special Agent Sullivan said Rick's scratches were similar to those received when working in a yard and were not significant injuries. Officers also interviewed those who worked in Rick's crew on June 1st and an employee of Munford Tire and Brake.

Special Agent Sullivan testified that on June 2nd, he and detective Nessley interviewed the defendant at the Tipton County Sheriff's Office. (Vol. 10, p. 457) The interview began at 3:23 a.m., and the defendant left the interview room at 4:51 a.m. Special Agent Sullivan advised the defendant that he was free to leave at any time. He said the defendant was not under arrest at that time.

The defendant told Special Agent Sullivan that his girlfriend dropped him off at his house at approximately 8:00 a.m. on June 1st. The defendant then went to Rick's house to receive his wages for his work the previous week. He first stopped by the home of Kevin and Brittany Sisco, Rick's neighbors. When he arrived at Rick's residence, Ray Horne, Hunter Fleming, Jose Froilan, Kevin Sisco, and John Parker were there. The defendant said he

received his money from "Little Rick," Rick Harris' son. He then returned home, counted his money, and realized that he only had been paid $300.00. The defendant generally received $350.00 each week. He believed he had been "shorted" and returned to Rick's house. The defendant said the victim was the only person there.

The defendant said that the victim met him at the front door and that he told her that he wanted to know why his wages were less than he normally made. The victim retrieved the cordless telephone from inside the house, called Rick, and gave the telephone to the defendant. Rick told the defendant that his wages were less because the defendant had missed some work during the previous week. The defendant said he missed work for a doctor's appointment. He also said he never entered Rick's house and returned home following the telephone conversation. He then changed clothes.

Special Agent Sullivan testified that he obtained buccal swabs from the defendant and Rick and submitted them to the crime laboratory. He also submitted a marijuana necklace that he had observed at the defendant's house on June 2nd and recovered from the defendant's girlfriend on June 8th. Other evidence submitted to the T.B.I. crime laboratory included one pair of black SAS shoes, one pair of Arapaho boots, one pair of size ten black Air Jordan tennis shoes, a black "do-rag," a black pair of jeans with a blue image on them, and a blue pair of boxers. The boxers were collected from the garbage at the defendant's home. Several hairs were collected from the victim's hand and at the crime scene in the woods.

Special Agent Sullivan said that on June 3rd, he, Detective Sheri Wassel, Detective Chris Williams, Detective Nessly, Deputy Chief Turner, and Sheriff Panco Chumley located a second crime scene approximately one hundred feet from where the victim's body had been discovered. A condom, a gun, and broken sticks were recovered from that area. Officers determined that the gun was actually a lighter. In the same area, officers found a trail of disturbed leaves that led to the location where the victim's body was found.

On cross-examination, Special Agent Sullivan testified that the crime scene included the residence, the front yard, and the wooded area. He learned that various people had visited the crime scene before he arrived and that individuals other than law enforcement may have entered the woods and been near the victim's body. He recalled a statement where a person acknowledged touching the victim's body. At some point, law enforcement brought Rick Harris inside the home.

Special Agent Sullivan said there was no direct trail "per se" from the home to the area where the victim's body was found. The grass was laid over in the path and appeared to be fresh. Special Agent Sullivan said that the grass was not trampled but that it appeared

as if someone had walked through the area.

Special Agent Sullivan stated the underbrush in the woods included leaves, sticks, and small saplings. He agreed that if he had not been wearing shoes the underbrush would have scratched or bruised his feet. He also saw poison ivy near the victim's body. He said the distance between the defendant's home and the victim's home was less than one mile. He walked from the area where the victim's body was discovered, through the area where the grass had been knocked down, down Richardson Landing Lane, to Richardson Landing Road, and to the defendant's front porch. He then reset his stopwatch and walked back to the area where the victim's body was found. He said it took him seven minutes and thirty seconds to walk to the defendant's house and seven minutes and twenty-five seconds to return to the area where he began.

When Special Agent Sullivan interviewed the defendant, he saw no visible scratches or bruises on him. Special Agent Sullivan later learned that a fingernail had been recovered from underneath the victim's body. He said the fingernail could indicate some type of defensive posture or intense fight occurred. He observed a small scratch on Rick's right middle finger and a small scratch or crease on one of the knuckles on his right hand. He also observed a scratch on Rick's left arm that was approximately one inch long and three smaller scratches on the inside of his left forearm. He said Rick's shoes were never collected and submitted for DNA testing because Rick had been eliminated as a suspect.

A black hat was recovered on a four wheeler trail that went down into the woods and ended near the home of Thomas Harris, Rick's father. Special Agent Sullivan believed he recovered the hat but did not know when he recovered it. The hat was not subjected to DNA testing. A plastic bag was recovered from the crime scene. Special Agent Sullivan said the bag appeared to have been the type used by emergency medical technicians during the course of rendering first aid. Law enforcement also recovered pieces of wood at the second crime scene where the condom and gun/lighter were recovered. Special Agent Sullivan did not believe that Ms. Bell had told him that the gun/lighter had been stolen from her home.

Special Agent Sullivan testified that he reviewed Rick's cellular telephone records. At 1:10 p.m. on June 1st, Rick received a call from the land line at his residence that lasted approximately one minute and two seconds. The next call from Rick's telephone was at 1:24 p.m. and lasted one minute and seven seconds. The records reflected that at 1:32 p.m., there was a call that went to voicemail. There was no activity on Rick's cellular phone from 1:32 p.m. to 2:19 p.m. At 5:39 p.m., there was some attempt of communication between Rick's cellular telephone and the land line at his residence. At 8:05 p.m., there was a call from the land line at Rick's residence to his cellular telephone. After that call, there were numerous calls back and forth between Rick's cellular phone and the land line.

On redirect examination, Special Agent Sullivan testified regarding the inability to seize every item at the crime scene because there was "junk" everywhere. Law enforcement determined what evidence to collect based upon their interviews with witnesses and their experience. Both a T-shirt with a reddish-brown stain and the plastic bag were recovered in an area directly behind Rick's home. After the emergency personnel arrived, the plastic bag was found about twenty yards from the home and within eighty yards of the victim's body. Special Agent Sullivan noted that Rick had an alibi from 1:30 p.m. to 8:30 p.m. on June 1st. Law enforcement verified the information.

Special Agent Sullivan said the four wheeler trail was located approximately twenty yards away from the walking trail. The black hat was found approximately thirty yards away from the entrance of the four wheeler trail. Special Agent Sullivan stated that the hat appeared to have been at that spot for some time. A branch was laying over the hat, and the hat was dirty and appeared weathered. Special Agent Sullivan did not believe that the hat was worn by the person who killed the victim at the time of her death.

On re-cross examination, Special Agent Sullivan testified that Rick Harris was with several people at the time of the offenses, including Ray Horne and Rick Adam Harris. Special Agent Sullivan was not aware that Rick Adam had been "waffling" regarding the alibi.

Deputy Chief Donna Turner with the Tipton County Sheriff's Office responded to the scene on June 1st, arriving at 9:55 p.m. When she arrived, she was met by Corporal Tremaine Reed. The officers had set up a perimeter around the area. Corporal Reed escorted Chief Turner to the residence and provided her with a brief overview. Corporal Reed, Chief Turner, and Detective Sheri Wassel walked through the house and then to a location at the bottom of a ravine and down into a wooded area behind the house where Chief Turner saw the victim's body. Emergency medical personnel were already at the scene.

Chief Turner testified that once they determined that a homicide had occurred, she contacted the district attorney general. The district attorney general's office requested that the T.B.I. send an agent and their crime scene team to assist in the investigation. Special Agent Sullivan, Special Agent Robert Marshall, and the Violent Crime Response Team arrived at the scene. Chief Turner led Special Agents Sullivan and Marshall to the victim's body.

Chief Turner said the backyard behind Rick's house was mowed. Behind the mowed portion of the yard were weeds, some of which were taller than Chief Turner, who was five feet, nine inches tall. After walking through the weeds, Chief Turner came to a thick wooded area with a "chicken wire" fence that had not been maintained. The fence had been trampled

down, and bushes, kudzu, and vines had grown through the fence.  Deputies were watching over the victim's body and directed Chief Turner and Special Agents Sullivan and Marshall to the location.  The victim's body was located in an area that was open, circular, and sunken.

Chief Turner stated that her first priority was to remove the victim's body from the area because the bugs and heat were causing her body to deteriorate.  The victim's body remained at the location until approximately 5:00 a.m. on June 2nd when law enforcement determined how to remove her body from the location.  Two deputies were assigned to remain with her body at all times.  Deputies used yellow spikes to mark the position in which the victim was found.  They also placed yellow crime scene flags throughout the woods so that law enforcement officers would not get lost.

Chief Turner testified that both the house and the wooded area were maintained as crime scenes.  The only two areas where someone could enter the woods were secured with yellow tape.  One trail or walkway expanded from the left of Rick's home to the tree line.  The trail did not lead into the depths of the woods but ended at another residence.  The trail was a "beaten path" that had been used frequently.  The second trail was located to the right of the house where a boat and other items were stored.  Chief Turner said officers were unable to secure the entire area with yellow tape.  Rather, a deputy in a marked car remained at the scene until the scene was released on June 6th.  Chief Turner said that while maintaining a crime scene for such a long period of time was unusual, officers required such time to search the area.  Officers were unable to search the area one of the days due to a storm.

On June 8, 2010, Chief Turner and Detective Wassel interviewed the defendant.  Chief Turner read the defendant his rights, and the defendant signed the waiver of rights form.  Chief Turner said that the defendant did not appear to be under the influence of drugs or alcohol and that she did not threaten him.

The defendant told Chief Turner that he began working for Rick Harris in May of 2010 and was paid $350.00 each week.  He denied having any problems with Rick.  He said he learned of the victim's death from a neighbor and not the police.  On the Sunday before the victim's death, the defendant called Rick and left a message that he was vomiting and would not be at work that Monday.  Rick never returned his call.  On Sunday night, the defendant stayed with his girlfriend, Sharhanda Jones.  The defendant said he called Rick the following day.  Rick told him that he was playing poker and instructed him to come to Rick's house the following day.  On Tuesday, June 1st, the defendant and Ms. Jones went to the library, and Ms. Jones then drove the defendant home.

The defendant said that upon arriving home, he called Rick and asked Rick about

-23-

receiving his wages. Rick instructed the defendant to come to his house and to do so quickly because Rick was leaving soon. The defendant walked to Rick's house. When he arrived, the defendant saw Mr. Parker, "Tank," Rick Adam Harris, "Jose," and "Hunter." The defendant did not see Rick Harris or the victim. Rick Adam exited the house and paid the defendant. The defendant said he did not count the money at that time. He spoke to "Tank" about Rick not needing him to work that day. The defendant stated he then returned to his mother's home and counted his money, which totaled $300.00. When he discovered that he had not been paid $350.00, he said that he returned to Rick's home but that Rick was not there. The defendant saw the victim on the porch and asked her about Rick. The victim told the defendant that he had just missed him. The defendant informed the victim that he had a question regarding his pay, and the victim said she would call Rick. The victim called Rick and gave the telephone to the defendant. The defendant said Rick reminded him that he did not work that Monday but called in sick. After the call, the defendant left Rick's home around 1:30 p.m. and returned to his residence. He denied entering Rick's house when he spoke to the victim. He said that the victim entered the house to retrieve the telephone but that he did not enter the house with her.

The defendant told Chief Turner that after talking to Rick on the telephone, he went to Brittany Sisco's house. Ms. Sisco came to the door, and the defendant asked if Kevin Sisco was there. Ms. Sisco said Mr. Sisco was at work, and the defendant returned home. The defendant stated that his mother arrived home from work and that she generally returned from work at 2:00 or 2:10 p.m. He then picked up his brother, Allen, purchased gasoline at an Exxon in Watertown, and drove to Raleigh. He stated that when he went to Raleigh, he was wearing black pants with grey and silver lining on the pockets, jeans, a white T-shirt, a white and blue Carmelo Anthony jersey, black Jordan sneakers, and a black "wave" cap or "do-rag." The defendant said he wore the same clothing both times that he went to Rick's house. He changed clothes when he returned to his mother's house due to the heat. He wore the same T-shirt and jersey, did not take a shower, and put on blue shorts.

The defendant denied ever being in the woods behind the victim's house. Chief Turner testified that she showed the defendant a photograph of a gun and that he denied that he had seen the gun in his house or touched it. Chief Turner asked the defendant about a condom wrapper that had been observed at his house. The defendant said he doubted there was a used condom at his home but that he used a condom "last night, this morning" in Memphis with his girlfriend. Chief Turner stated that "last night, this morning" would have been June 7th or 8th. Chief Turner showed the defendant a photograph of the wooded area where officers recovered a condom. The defendant did not comment.

Chief Turner testified that the condom was recovered when officers returned to the crime scene on June 3rd. Several law enforcement officers assisted in searching the area

-24-

where the victim's body was found. As Chief Turner was standing where the victim's body was found, she received a call on the radio from Sheriff Chumley instructing her to come to the top of a hill near the area. Chief Turner said that while walking toward the area where Sheriff Chumley was located, she noticed disturbed debris in the wooded area, especially along the line of trees that were leading back to Sheriff Chumley's location. Small saplings and small branches had been bent down or broken. Chief Turner and Detective Chris Williams met Sheriff Chumley and Detective Nessly. The sheriff identified what appeared to be a condom. Chief Turner stated that the condom was difficult to see due to its color and the thickness of the leaves in that area. As a result, she directed Detective Williams to stand next to the condom. Chief Turner then saw the gun nearby. She picked up the gun, inspected it, and determined that the item actually was a replica of a gun.

Chief Turner testified that there were markings in the foliage as if something had been drug through the area or someone had scuffled his or her feet. There were broken logs in the area, and vegetation was laying down as if someone had been lying in the area. Chief Turner also observed a "butt print" where it appeared as if someone had been sitting down. Officers collected pieces of wood found near the condom that were not in a natural position. The pieces were in an area where it appeared that someone had been lying down, and a hair was on one of the pieces. Officers collected and submitted the wood and hair to the T.B.I. crime laboratory for DNA analysis. Hairs from the victim's head and in her left hand also were sent to the T.B.I. crime laboratory.

Chief Turner said that there were many abrasions on the victim's back and that her clothing was in disarray. The victim's bra and shirt were down, and she was exposed. Her underwear was completely rolled up. Her shorts were up, and dirt that was not consistent with the dirt in which the victim was found lying was on her shorts. The victim was lying in green foliage and had a great amount of blood in the area of her head.

On cross-examination, Chief Turner testified that when she arrived at the crime scene on June 1st, several people, including the victim's friends and family, were present. Chief Turner noted that Kelly Phelps had touched the victim's right leg, foot, and shorts and that Dustin Perdue also had touched the victim's body. Rick Adam Harris, Rick Harris, Josh Harris, Brittany Sisco, and Hunter Fleming had entered the house. The house was released to Rick Harris on June 3rd.

Chief Turner observed poison ivy or poison oak in the area of the victim's body but not in the immediate area. The foliage on the ground was thick in areas and included branches with thorns on them. Chief Turner said that a person would not be able to walk through the area on his or her bare feet without injury.

Special Agent Robert Marshall, a forensic science supervisor with the T.B.I., testified that he was the team leader of the Violent Crime Response Team. On June 1, 2010, at approximately 11:15 p.m., Special Agent Marshall received a call to report to the crime scene. Upon arriving at the scene, he received a report from Special Agent Sullivan and Chief Deputy Turner. Special Agent Marshall and his team then conducted a brief pre-inspection of the residence. He observed an office located inside the front door and to the left. He noted that several items appeared to have been disturbed in the office. The computer was disrupted, and the chairs were turned over onto the floor.

Special Agent Marshall said he wanted to first focus upon the victim's body and any evidence in the area where she was found. The team then worked backwards to the house where they believed that the incident began. Special Agent Marshall said the victim's body was discovered in a wooded area outside the back entry way of the house. A small area of the back yard was mowed, but most of the grass reached Special Agent Marshall's mid-calf. The wooded area was approximately ten to fifteen yards from the victim's residence. Special Agent Marshall described the terrain in the woods as "rough" and said it included high grass, weeds, kudzu, hills, and many trees. He noted a great deal of insect activity, including mosquitoes and gnats. He said the insect activity and heat would have caused the victim's body to degrade. He did not want the evidence to degrade to the point where it would no longer have been pristine and wanted to do whatever he could to maintain the evidence.

Special Agent Marshall testified that while he and his team were in the woods, they relied upon lights provided by the Shelby County Sheriff's Department and the headlights from the violent crime scene response van. He said gathering the evidence was difficult. At one point, they had to work using flashlights because the electrical cords on the other lights were not long enough. They also had to work quickly because the heat caused the lifetime of the batteries in the flashlights to dissipate. As a result, they had to complete all tasks possible in a minimum amount of time.

Special Agent Marshall stated that his team recovered two cellular phones, a pair of reading glasses, a pair of sunglasses, a T-shirt, and a golf club shaft from the crime scene. The golf club shaft was found in the wooded area while they were en route to the victim's body. It was sticking out of the ground, and the end was broken off of it. The T-shirt with a reddish-brown stain was recovered outside the back entrance of the house and near the corner or the back side. The team also took a latent fingerprint, the entire crossbow lock from the back entry, and some contact vacuumings and standards of those vacuumings. The team transported the evidence to the T.B.I crime laboratory where they conferred with the case agent and determined what items were pertinent to the case.

Lieutenant Richard Nessly, supervisor of the Criminal Investigative Division of the

Tipton County Sheriff's Office, testified that he was involved in the search of the wooded area and the videography of that search on June 3, 2010. Lieutenant Nessly recorded the search conducted by Sheriff Chumley, Chief Turner, Special Agent Sullivan, Detective Sheri Wassel, and Detective Chris Williams. During the search, a fingernail was recovered near the area where the victim was found. While the fingernail was being processed, Sheriff Chumley found a condom while he was on top of a ridge. A novelty pistol/lighter was recovered near the condom. Chief Turner showed Lieutenant Nessly a drag path in the leaves going toward the area where the victim's body was recovered.

Lieutenant Nessly testified that on June 1st, Chief Turner contacted him and told him to go to the defendant's residence. He arrived at approximately 9:30 p.m. and saw the defendant sitting on a chair outside by the front door with two officers from the Sheriff's Office. At that time, Lieutenant Nessly only knew that a homicide had occurred but did not know anything about the case. He said the defendant was a "person of interest" and the last person to have seen the victim alive. Lieutenant Nessly stated that the evidence was not sufficient to justify arresting the defendant at that time. The defendant was free to leave.

Lieutenant Nessly said he questioned the defendant regarding his identifying information and his whereabouts for that day. The defendant said he did not work on June 1st because his boss told him that he did not have to do so. He did not recall when he last worked. He said he was supposed to have worked the day before but called in sick. He also said he had been at his girlfriend's apartment in Raleigh for the past few days. The defendant told the lieutenant that he went to Rick's house that day to receive his wages. He then returned home and counted his money. When he discovered that his wages were $50.00 less than he usually was paid, he returned to Rick's residence. The defendant said that Rick was not there but that he spoke to a woman who was at Rick's house. The woman called Rick, and the defendant spoke to him. The defendant stated that he then returned home and waited for his mother to return from work. He drove his mother's car to his girlfriend's apartment in Raleigh. He said he was wearing black pants but changed when he returned home from speaking to Rick over the telephone because it was hot. The defendant also said his mother returned home at approximately 2:30 p.m. or 2:40 p.m.

Lieutenant Nessly testified that the defendant consented to the search of his room. A silver necklace with a marijuana emblem and an open condom wrapper were on the defendant's bed. Wet clothing was in the washing machine. Lieutenant Nessly said officers photographed the bottom of shoes and searched for any items that they believed were relevant. He and Special Agent Sullivan later spoke to the defendant at the Sheriff's Office. On June 8th, they returned to the defendant's house and spoke to his mother. The defendant was not at home.

Lieutenant Nessly said he, Special Agent Sullivan, and Detective Rodriguez went to an apartment complex in Raleigh where they believed the defendant was staying with his girlfriend, Sharhonda Jones. They found the defendant there and arrested him. Ms. Jones was wearing a silver necklace with a marijuana leaf emblem that was similar or identical to the necklace that Lieutenant Nessly saw in the defendant's room on June 1st. Officers seized the necklace and sent it to a laboratory to be analyzed.

On cross-examination, Lieutenant Nessly testified that when he was dispatched to the defendant's home on June 1st, he knew that a homicide had occurred and that a lady had been discovered in the woods. He did not know that the victim had been involved in a struggle. He examined the defendant's hands and arms when the defendant came to the Sheriff's Office at 3:00 a.m. or 4:00 a.m. on June 2nd and did not see evidence indicating that the defendant had been involved in a fight or struggle.

Lieutenant Nessly did not recall whether the defendant was handcuffed when he arrived at the defendant's residence on June 1st. He said that if the defendant was handcuffed, he instructed officers to remove them. He later learned that Ms. Bell was inside sitting on her couch but did not recall whether an officer was with her. Lieutenant Nessly was with the defendant for one to two hours. At one point, the lieutenant went to the scene to learn pertinent information about the case. When he returned to the defendant's house, he still was not focused on the time period between 1:00 p.m. and 3:00 p.m. At the time, Lieutenant Nessly did not know when the offenses occurred but only knew that the defendant had to account for his whereabouts that day. He later learned that the defendant was the last person to have seen the victim alive. At the time, he was not aware that the victim had received a telephone call at 1:30 p.m. on June 1st.

Lieutenant Nessly said Ms. Bell told him that she returned home from work on June 1st at 2:00 p.m. She said that when she returned home, the defendant was lying on the couch. Lieutenant Nessly stated Ms. Bell calmly answered his questions. Ms. Bell, the defendant, and the defendant's brother, Michael, willingly and voluntarily answered the officers' questions.

Lieutenant Nessly testified that officers did not collect a great amount of evidence that night. They may have collected shoes and one pair of glasses. Lieutenant Nessly said officers essentially looked in the defendant's room for any items that were in plain view. They were searching for blood and a weapon. Officers walked throughout the house but did not see any evidence that something suspicious had occurred inside the house. Lieutenant Nessly did not see any blood or any evidence that a person had committed a murder. He and Special Agent Sullivan interviewed the defendant again at the Sheriff's Office from 3:20 a.m. to 4:50 a.m.

On redirect examination, Lieutenant Nessly testified that when he responded to the defendant's residence, he was not told that the defendant had been seen at the victim's home at 1:30 p.m. that afternoon. According to his notes, the defendant said his mother returned home from work at 2:30 p.m. or 2:50 p.m.

Detective Chris Williams of the Tipton County Sheriff's Office testified that he was involved in the processing of the crime scene and was present during the videotaping of the search of the wooded area on June 3, 2010. He said that during that time of the year, the wooded area was very dense. The trees were green, and a great amount of dead foliage was on the ground making evidence on the ground difficult to see.

Detective Williams stated that when the condom was located, Chief Turner instructed him to act as a "human marker" on the evidence. He placed his foot approximately sixteen inches away from the condom and pointed his foot directly at it. He remained in that position for approximately fifteen minutes. Chief Turner located the gun while Detective Williams was marking the condom. The gun was behind Detective Williams and to his right and was within three to four feet of the condom. Detective Williams also saw a clearing in the dirt that appeared to be in the shape of human buttocks within a few feet from the condom. There was no well-worn path in the area where the condom and gun were found.

Detective Williams testified that he and Special Agent Sullivan located a cap while walking the four wheeler trail. They were following up on how James Arcutt had returned after going to his house to get his cigarettes. Detective Williams and Special Agent Sullivan were advised that Mr. Arcutt had come from Thomas Harris' house, through the woods, and up to the back of Rick's house. The cap was located a substantial distance from where the victim's body was found. To go to the victim's body from that location, Detective Williams and Special Agent Sullivan would have had to have walked through an area of high grass and down to the bottom of a ravine. Detective Williams said the cap was dirty and had debris on top of it. Although it appeared that the cap had been at that location for some time, Detective Williams collected it anyway.

Detective Sheri Wassel of the Tipton County Sheriff's Office testified that she went to the scene on June 1st and entered the residence. An office area was located to the left of the entryway. Detective Wassel said it appeared as if a scuffle had occurred in the office area. A chair was upside down, and the computer was knocked over. There were several items scattered across the floor. Detective Wassel later signed a form submitting a condom, a known blood sample, and a replica of a pistol to the T.B.I. for analysis.

On cross-examination, Detective Wassel testified that when she first arrived on the scene, several people, including those outside law enforcement, were present. At that time,

she did not see anyone collect evidence, clothing, or boots from Rick Harris. She was not with Rick during the majority of the investigation.

Detective Wassel stated that on June 3rd, she found the fingernail that was near the area where the victim's body was discovered. The fingernail was photographed, measured, and collected. While Detective Wassel was processing the fingernail, the sheriff found the condom. Detective Wassel collected the condom and placed it into a container. Fluid was inside the condom. She said she did not collect the condom immediately after it was found due to the risk of mildew developing if it was collected and sealed. Officers continued collecting other evidence and collected the condom once it began to rain.

Dr. Lisa Funte, a forensic pathologist and medical examiner at the Shelby County Regional Forensic Center in Memphis, was accepted by the trial court as an expert in forensic pathology. Dr. Funte performed the autopsy on the victim. She described the victim as a thirty-six-year-old Caucasian female with dark shoulder length hair and highlights. She was approximately 5'5 and was somewhat thin. When Dr. Funte received the victim's body, it was in a state of very early decomposition. Dr. Funte said it was not possible to determine the exact time of the victim's death.

Dr. Funte testified that the cause of death was strangulation associated with blunt force injuries. She determined that the manner of death was homicide. She said some of the blunt force injuries were so extensive that they could have caused death in and of themselves. She explained that blunt force injuries can be caused by an object striking the body or the body striking an object. Blunt force injuries fall within three categories: contusions or bruises, abrasions or scrapes, and lacerations or tears of the skin. Dr. Funte noted abrasions and contusions on the victim's head, torso, arms, and legs. There also were contusions and lacerations on the victim's upper and lower lips. Some of the victim's fingernails were broken, and a thumb nail was ripped off.

Dr. Funte said the victim had hemorrhages in the tissues of her scalp and temporalis muscles bilaterally. The temporalis muscle is the temple that aids in chewing. The injuries were the result of blunt force trauma. The victim had a basilar skull fracture or hinge fracture that spanned across the base of the skull from one side to the other. The fracture continued upward into the sides of the skull. It spanned through the region where the spinal cord leaves the skull and goes into the vertebral column. A basilar skull fracture can cause contusion of the brain stem, which can result in the disruption of the rhythm of the heart and can be fatal.

Dr. Funte noted two types of intracranial bleeding: subdural hemorrhage and subarachnoid hemorrhage. The dura is the first membrane shown when a skull is opened. The next layer, the arachnoid layer, contains many blood vessels. The pia is the layer next

to the brain and is very thin and membranous. There are spaces between each layer where blood can collect. A subdural hemorrhage is blood between the dura and the arachnoid layers. A subarachnoid hemorrhage is blood between the arachnoid and pia layers. The subdural and subarachnoid hemorrhages are neurologic irritants. Dr. Funte explained that neurons in the brain receive signals and can control movement. An irritant such as a hemorrhage causes a disruption of that signaling and can result in neurogenic cardiac arrhythmia. The cardiac center becomes disrupted and does not tell the heart how to beat correctly. Dr. Funte said this interruption can cause a fatal arrhythmia. She also said that either the basilar skull fracture or the intracranial hemorrhage alone can be fatal.

Dr. Funte observed bruising and scraping to the left side of the jaw line and chin that she said could have been caused by the skull fractures. She explained that a hinge fracture, which spans across the base of the skull, results when the chin is impacted, pushing the chin up and fracturing a pivot area around the foramen magnum where the spinal cord comes up. Dr. Funte said a hinge fracture requires quite a bit of force. In extreme situations, the fracture could result from a blow to the head. Dr. Funte stated the victim's injuries could have been caused by a kick to her chin using either a foot or a knee. She further stated that the injuries more than likely resulted from a blow from a foot rather than a knee because a blow using a foot has more leverage than a blow using a knee. She stated that death as a result of the skull fracture could have been instantaneous because it could have caused cardiac arrhythmia. The fracture could have resulted in swelling to the brain causing death within minutes or hours.

Dr. Funte found bleeding in the anterior strap muscles located in the front of the neck. She said she generally did not see blood in these muscles. She noted extensive hemorrhaging throughout the soft tissue in the muscles of the anterior neck. The left portion or left horn of the hyoid bone was fractured. Dr. Funte explained that the hyoid bone is a fairly thin bone which connect the strap muscles and allows the muscles to exert force and move the neck from side to side and from front to back. Hemorrhaging was present in the upper chest muscles and soft tissues and the thyroid gland located in the neck.

Dr. Funte testified that she observed ligature strangulation. She observed linear marks on the victim's neck that may have been associated with a ligature but did not observe an obvious ligature furrow. She said the marks could have been consistent with a foot, log, or knee on the victim's neck or upper torso. She also said that the injuries on the victim's upper torso and neck area were consistent with being stomped. A large quantity of blood was in the strap muscles, through the soft issue and connective tissue, and to the back of the neck. Dr. Funte observed blood in the posterior oral pharynx and in the tongue. She explained that the presence of this blood meant that bleeding was in the back of the throat, as well as in the muscles of the tongue under the chin. The hemorrhage extended into the upper chest and

through the muscle and soft tissues of the upper chest.

Dr. Funte said the hyoid bone generally is fractured as a result of pressure from the outside inward. She also said the victim may have experienced pressure from the sides of the neck resulting in her hyoid bone fracturing. She stated that a fracture of the hyoid bone did not always result in cases of manual strangulation. In cases of manual strangulation, quite a bit of force is required to fracture the hyoid bone.

Dr. Funte found scleral and petechial hemorrhaging in the victim's left eye. Petechia is pinpoint areas of hemorrhaging that results when increased pressure in the capillaries causes them to break. Increased pressure could be caused by strangulation. Sclera is the white area of the eye. Dr. Funte found bleeding and pinpoint hemorrhages in the white area of the eye.

Dr. Funte testified that when a person is strangled, the blood flow through the external jugular veins can be blocked with six to eight pounds of pressure, which can lead to unconsciousness within a matter of seconds. She estimated that a person could lose consciousness within six to eight seconds and death within one minute if the blood flow through the jugular veins is restricted.

Dr. Funte said blunt force injuries were present on the victim's extremities, including the backs of her hands and the tops of her feet. The victim's left arm had petechial hemorrhages, abrasions, and a bruise. A "stretch type" laceration was at the base of the victim's right thumb. Dr. Funte said bending a thumb all the way back rapidly can stretch and tear the skin in the palm of the hand. She also said that the victim had lacerations at the base of her thumb that were consistent with those types of injuries.

Dr. Funte testified that the victim had a gaping laceration on the right side of her head and a bruise on her ear. She said the large gaping laceration and the linear laceration to the right side of the victim's head could have caused intracranial bleeding, which can be fatal. She also said that the length of time in which death could occur was not well-studied and that death could occur up to several hours following injury.

Dr. Funte testified that she collected fibers that were clutched in the victim's left hand and released them to Detective Williams and Chief Turner. Dr. Funte also provided Chief Turner with a sample of the victim's blood, hair from the victim's head, nail clippings and scrapings from her hands, a yellow metal ring with clear stones, paper bags that were placed on the victim's hands at the crime scene, and a sexual assault kit.

Dr. Funte stated she observed evidence indicating sexually related trauma. When she

received the body, the victim's clothes were in disarray. Her shorts and panties were pulled down. The victim had blunt force injuries to the inside of her thighs. She had bruising on her right leg, reddish-brown discoloration on her right knee, contusions on the inside of her left thigh, and a contusion or bruise on the inside of her right thigh. Dr. Funte did not see extreme trauma or mutilation to the genital area. She explained that in over 95% of cases where sexual assault was either suspected or known to have occurred, trauma is not present in the genitals.

Dr. Funte testified that the victim had dirt on her feet, bruises on her right leg and ankle, and an abrasion on the top of her foot with some bruising. The victim also had bruising and abrasions along the length of her legs, extending from her knees to the tops of her feet.

Dr. Funte was unable to provide a chronological sequence regarding the order in which the injuries occurred. She said the victim would have been alive at the time of the strangulation. She also said that the victim's head injuries occurred either prior to or at the time of death.

On cross-examination, Dr. Funte testified that when the victim's body arrived at her office, the victim's shorts were buttoned. The victim's shorts were pulled down slightly in the front, and her underwear was raised up above the shorts. Dr. Funte said the rape kit would have been performed as a precaution due to the beating that the victim received and even if her shirt had not been torn. She also said that the bruising on the victim's inner thigh was the only medical suggestion of any sexual assault. She explained that she examined the entire circumstances of the victim's death to determine that there was evidence suggestive of sexual assault. She acknowledged that anything could have been used to put pressure on the insides of the victim's legs. She also acknowledged that the victim had bruises and contusions essentially on all sides of her legs.

Dr. Funte observed blood underneath the victim's index and third fingers on her right hand. Her thumbnail was missing on her right hand. Dr. Funte said the injuries on the victim's hand were consistent with her scratching someone. She also observed bruising on the back of the victim's right hand and her knuckle at the base of her index finger. She stated these injuries were consistent with the victim's hand coming in contact with an object. There were no lacerations or abrasions on the bottom of the victim's feet.

Dr. Funte was unable to determine the number of blows that the victim sustained to her head. The hinge fracture likely was the result of one blow, and the victim sustained three lacerations to the head. Dr. Funte said the victim sustained at least four blows and possibly more to her head. Any of the blows could have been fatal, and any of them could have

resulted in death instantly.

Dr. Funte acknowledged that she could not be certain that some type of hand-to-neck strangulation was involved. She said a combination of hand-to-neck strangulation and a blow to the throat could have occurred. The victim could have sustained multiple blows to her throat.

Dr. Funte testified that the damage to the victim's neck could have been caused by a very forceful punch upwards. The smaller the neck, the less resistance to that force and the more likely a punch could have caused the resulting trauma. Dr. Funte could not rule out that the injury could have been caused solely by a punch or by an object harder than a hand.

Dr. Funte was unable to determine which blow or the number of blows that caused the victim's death. Rather, she opined that several blows caused the victim's death. Dr. Funte was not able to specify the type of encounter that was involved. She said that the trauma could have been caused by stomping, punching, or a combination of the two and that rocks could have been involved. She did not know how long the assault occurred and said it could have taken a long time.

John Hoang, a trace examiner for the Arizona Department of Public Safety in Phoenix, Arizona, was admitted by the trial court as an expert in trace examinations and hair comparisons. Mr. Hoang testified that he worked in one of the regional laboratories under contract with the Federal Bureau of Investigation ("F.B.I.") and assisted the F.B.I. in hair examinations and comparisons. He said that hair is not a form of identification and that he could not determine whether a particular hair came from a specific person due to the number of characteristics in each person's hair.

Mr. Hoang testified that he compared a bindle of the victim's head hairs with two sets of questioned head hairs. One set included ten questioned head hairs, and the other set included three questioned head hairs. Mr. Hoang conducted a microscopic examination of the hairs to determine whether any similarities existed. He determined that nine of the hairs were consistent with having a common origin with the victim's head hairs. He noted that the questioned hair and the victim's hair had some hair treatment and damage that could have resulted from the hair treatment or from the elements. He said, however, that because the remaining unknown hairs were grey or lacked pigmentation, he could not establish a common source between those hairs and the victim's hairs. He also said the unknown hairs were consistent with Caucasian hair.

On cross-examination, Mr. Hoang testified that he did not have personal knowledge regarding where the hairs were recovered or how they came to him. He said that nine of the

hairs were consistent with the victim's hair. The remaining hairs had treatment and were damaged and grey. As a result, Mr. Hoang could not testify that the remaining hairs belonged to the victim. On redirect examination, he testified that grey hair means that the hair is colorless or has no pigmentation. He stated that four of the hairs were inconclusive and could not be included or excluded as consistent with the victim's hair.

T.B.I. Special Agent Lawrence James, a forensic scientist assigned to the DNA and Forensic Biology Section, was admitted by the trial court as an expert in serology and DNA comparison. Special Agent James performed a DNA analysis on a blood stain that was on a T-shirt collected from the backyard of the victim's home. He determined that the blood belonged to the victim. He attempted to obtain a DNA sample from the shirt's collar to determine who was wearing it but was unable to obtain a DNA profile. He was unsure who owned the shirt and whether it was worn during the offense.

Special Agent James testified that he found sperm cells in a vaginal swab taken from the victim. He obtained a mixture profile off that sample with the victim as the major contributor and Rick Harris as the minor contributor. The defendant was excluded from that mixture.

Special Agent James obtained touch DNA, or DNA left behind when someone has handled an item, from the rough and uneven areas of the lighter/gun. He obtained a partial DNA profile that matched the defendant. He obtained data at nine of the thirteen areas of a DNA profile that matched the defendant. Special Agent James said he excepted to have a greater chance of obtaining fingerprints off the lighter/gun than DNA due to the difficulty in obtaining touch DNA. In swabbing the lighter/gun for DNA, he avoided the smoother areas to avoid interfering with any potential fingerprints.

Special Agent James also tested the condom that was collected at the crime scene. He noted that the sample was degrading. The condom remained outside in hot weather until it was collected two days after the offense. Special Agent James said DNA can be destroyed by bacteria, environmental extremes such as humidity, ultraviolent exposure through sunlight, or chemicals. He also said that a wet sample may be destroyed if it is packaged into something that does not allow it to breathe. He noted that condoms are made out of latex, which does not breathe.

Special Agent James testified that he saw fluid on the inside of the condom. He tested both sides of the condom separately and treated them as two different samples. He found semen on the inside of the condom and obtained a partial DNA profile. He obtained data at two of the thirteen areas that matched the defendant. Special Agent James also found sperm cells on the outside of the condom. He explained that frequently the liquid on the inside of

a condom will leak. He obtained a full DNA profile that matched the defendant.

Special Agent James tested the necklace with the marijuana leaf charm and received weak positive results through presumptive testing for blood. He explained that presumptive testing is not a confirmatory test but a screening test. Further testing is required to confirm the presence for blood. Special Agent James attempted to obtain DNA from the area but was unable to obtain a profile. He did not believe that human blood was on the necklace. Rather, other items, such as rust or grease, may test positive as blood in presumptive testing.

Special Agent James testified that a stain on a pair of boxer shorts tested positive for blood through presumptive testing. He was unable to obtain a DNA profile from the stain. He said that the stain was not visible and that a blood stain generally is visible.

On cross-examination, Special Agent James testified that none of the evidence tested had the DNA of both the defendant and the victim. He said that as long as a condom is not damaged or destroyed, DNA could survive outside of a condom for possibly weeks. The DNA on the inside of the condom was degraded. Special Agent James stated that he generally expected to find the DNA of two people on the outside of a condom but that he only found the defendant's DNA. He did not see any evidence that cross-contamination occurred.

After the State rested its case, the defendant presented the testimony of Arthur Chen, who was employed with the Millington Telephone Company. He reviewed records from the land line telephone number associated with the victim's house. He stated that on June 1, 2010, at 1:30 p.m., an incoming call came from telephone number 901-5XX-XXXX that lasted forty seconds. Mr. Chen could not determine whether the call was answered by a person or an answering machine. The next call that was answered from the land line was at 8:09 p.m. The only incoming call from Rick's cellular phone number was at 8:09 p.m.

Johnnie Phelps testified that in June 2010, his cellular phone number was 901-5XX-XXXX. He said that on June 1st, he attempted to call Rick Harris on his cellular phone three times but that Rick did not answer. Mr. Phelps could not recall when he first attempted to call Rick. He also called Rick at 12:30 p.m. and 2:30 p.m. Mr. Phelps said Rick's failure to return his calls seemed odd because Rick generally returned his call within fifteen to twenty minutes unless Rick was out of range. Mr. Phelps testified that he called Rick's land line at 1:30 p.m. and that the victim answered. He said that the victim sounded normal and that he did not hear any dogs in the background.

On cross-examination, Mr. Phelps testified he called Rick's cellular phone twice on the morning of June 1st. Mr. Phelps hung up the first time and received Rick's voicemail the

second time. He made both calls before 1:30 p.m. Mr. Phelps then called the land line. He attempted to call Rick at 2:30 p.m. after he had spoken to the victim.

Harry Ellens, Jr. testified that he was good friends with Rick Harris and had been to his home approximately three dozen times. He, along with his roommate, Bobby Hill, drove to Rick's home in his truck on June 1, 2010. They arrived at approximately noon. Mr. Ellens said he saw an African American man standing by himself at the beginning of Rick's driveway and approximately thirty feet from Richardson Landing. Mr. Ellens also saw several people who appeared to have been cooking out at the first house to the right. He said he waved at them, and they waved back.

Mr. Ellens testified that when he knocked on the door, he heard dogs barking. The outer door was open, but the screen door was closed. The victim came to the door. Mr. Ellens said he placed his foot on the door so that the dogs would not run outside. The victim told him not to worry about the dogs, and the dogs moved out of the way. Mr. Ellens held the door open and talked to the victim. She said he had just missed Rick. Mr. Ellens stated he remained there for approximately ten minutes. He did not see Rick that afternoon and did not attempt to call him.

Rebecca Harris, the former wife of Rick Harris, testified that she spoke to Rick during the trial and that he instructed her on how to testify. She said she did not want to testify. She also said Rick Adam told her that while at Munford Tire, he had to wait for Rick to arrive. Rick Adam did not tell her how long that he had to wait.

On rebuttal, the State recalled Rick Adam Harris. Rick Adam denied having any conversation with Rebecca Harris regarding the events of June 1st or waiting for Rick at Munford Tire. He said he never told Kevin Sisco that he had to wait for Rick at Munford Tire.

The defendant was charged with felony murder in the perpetration of a kidnapping, felony murder in the perpetration of a rape, aggravated kidnapping, and aggravated rape. At the conclusion of the evidence, the jury convicted the defendant of two counts of felony murder as charged, one count of aggravated kidnapping, and one count of aggravated sexual battery as a lesser included offense of aggravated rape.

## SENTENCING

During the penalty phase, the State presented copies of a judgment dated November 18, 1997, showing that "Richard Alvin Bell" with a date of birth of September 2, 1979, was convicted of robbery of a motor vehicle and aggravated assault in Pennsylvania. The parties

stipulated that the defendant's date of birth was September 2, 1979, and that he was in Pennsylvania in 1997.

The defendant presented the testimony of Belinda Bell, his mother. Ms. Bell testified that she loves the defendant and that it would hurt her if the defendant received the death penalty.

At the conclusion of the penalty phase, the jury found the following aggravating circumstances beyond a reasonable doubt: (1) the defendant was previously convicted of one or more felonies other than the present charge whose statutory elements involve the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death; (3) the defendant knowingly committed the murder while having a substantial role in committing kidnapping; and (4) the defendant knowingly committed the murder while having a substantial role in committing or attempting to commit rape. *See* T.C.A. § 39-13-204(i)(2), (5), (7) (2010). The jury also found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death.

During a separate sentencing hearing, the trial court sentenced the defendant to twenty years for each of the aggravated kidnapping and aggravated sexual battery convictions. The trial court merged the two felony murder convictions. The court ordered the defendant to serve the two twenty-year sentences concurrent to each other but consecutive to the death sentence.

## ANALYSIS

On appeal, the defendant asserts that: (1) he is intellectually disabled and, therefore, ineligible for the death penalty; (2) the evidence is insufficient to support the convictions; (3) the trial court erred in denying his two motions for a mistrial; (4) the trial court erred in refusing to allow the defense to question the victim's husband regarding an extramarital affair; (5) the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(7) is unconstitutional; (6) the absence of an intent to kill renders the death penalty disproportionate; (7) proportionality review should be modified and the pool of cases considered in proportionality review should be broadened; and (8) the sentence of death is arbitrary and disproportionate.

## I. INTELLECTUAL DISABILITY

The defendant contends that the trial court erred in concluding that he failed to establish that he is intellectually disabled. He asserts that he meets all three statutory

requirements deeming him ineligible for the death penalty.

## A. Evidentiary Hearing

Prior to trial, the defendant filed a motion to dismiss the State's notice of its intent to seek the death penalty in which he claimed that he was intellectually disabled and, therefore, ineligible for the death penalty. During a pretrial hearing, the defendant presented the testimony of Dr. John Hutson, a clinical psychologist who the trial court admitted as an expert in forensic psychology. Dr. Hutson testified that he treated the defendant in 1993 while the defendant was a patient in the adolescent unit at Lakeside Hospital. Dr. Hutson also was retained to evaluate the defendant for purposes of trial.

Dr. Hutson testified that when he treated the defendant in 1993, the defendant had just turned fourteen years old and had experienced turmoil in his life. The defendant's parents had divorced several years prior to the defendant's treatment, and he had lost contact with his father. The defendant was kept away from his father due to issues between the defendant's mother and his new step-mother. Dr. Hutson believed that the defendant's father was afraid to stand up to the two women in order to have contact with the defendant. Approximately one month after the defendant was released from Lakeside Hospital, he was admitted into Saint Joseph Hospital, a psychiatric hospital in Memphis that has since closed. The defendant later was transferred from juvenile custody in Tennessee to a boarding school in Pennsylvania.

Dr. Hutson said the defendant was very polite and well behaved but did not function at a high intellectual level. The defendant was very depressed but was not psychotic. Dr. Hutson stated that the defendant was in touch with reality and was able to communicate but was limited in his intellectual understanding. When the defendant was fourteen years old, Dr. Hutson administered the Wechsler Intelligence Scale for Children, Revised ("WISC-R") to the defendant, who received a full-scale I.Q. score of 77. The reported margin of error for the test was plus or minus seven points. Dr. Hutson said there is a 95% prediction that the defendant's I.Q. range was between 70 and 84.

Dr. Hutson testified that he met with the defendant on two occasions at the Tipton County Jail in 2010 and 2011. Dr. Hutson did not administer another I.Q. test to the defendant. Dr. Hutson said the defendant's verbal ability, understanding, and comprehension were consistent with his abilities in 1993. Dr. Hutson explained that verbal ability and comprehension almost never improves and that the defendant's abilities had not significantly deteriorated.

Dr. Hutson did not conduct a formal evaluation of the defendant's adaptive

functioning. He explained that one of the issues in conducting such an evaluation was that the defendant had not really functioned outside of an institutional environment for one year or more at a time since adolescence.

Dr. Hutson testified that the defendant fell within the borderline range of intelligence. Dr. Hutson said any complex language had to be explained to the defendant. When Dr. Hutson questioned the defendant, he did not rely upon any "yes" or "no" answer given by the defendant. Rather, he then asked follow up questions to determine whether the defendant understood the original question.

Dr. Hutson concluded that the defendant was competent to proceed to trial. Dr. Hutson said the defendant was able to communicate if the language was not too abstruse or if the concepts were explained to him in simple terms. He also said the defendant understood the charges and the potential consequences that could result if convicted. He stated that while the defendant was impaired in his ability to understand the judicial process, he could grasp the roles of each person if explained to him.

On cross-examination, Dr. Hutson testified that the defendant is not intellectually disabled. Dr. Hutson based his conclusion in part upon the results of the I.Q. test that he administered to the defendant in 1993. He clarified that he administered the third edition and not the revised edition of the WISC. He did not recall reviewing a report from Saint Joseph Hospital stating that the defendant received a full-scale I.Q. score of 84 on the WISC-III approximately two months after Dr. Hutson administered the test to him. Dr. Hutson expected the defendant to receive a higher score on the test after he had been exposed to the same test two months before.

Following the evidentiary hearing, the trial court entered an order denying the defendant's motion to dismiss. The trial court noted that the defendant received a full-scale I.Q. score of 77 on the WISC-III. The court further noted that even though Dr. Hutson testified that a margin of error existed regarding the test score, he also testified that the defendant was not intellectually disabled.

## B. Analysis

In 1990, Tennessee Code Annotated section 39-13-203 was enacted prohibiting the execution of defendants who were intellectually disabled at the time that they committed first degree murder. Tenn. Code Ann. § 39-13-203(b); *Howell v. State*, 151 S.W.3d 450, 455 (Tenn. 2004); *Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001). Although the statute is not to be applied retroactively, the execution of intellectually disabled individuals violates constitutional prohibitions against cruel and unusual punishment. *Howell*, 151 S.W.3d at 455

(citing *Van Tran*, 66 S.W.3d at 798-99); *see also Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

In Tennessee, "intellectual disability" rendering a defendant ineligible for the death penalty requires:

> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below;
>
> (2) Deficits in adaptive behavior; and
>
> (3) The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). All three prongs must be satisfied to establish intellectual disability.

The defendant has the burden of establishing intellectual disability by a preponderance of the evidence. Tenn. Code Ann. § 39-13-203(c); *Howell*, 151 S.W.3d at 465. The issue of whether a defendant is intellectually disabled and, thus, ineligible for the death penalty is a mixed question of law and fact. *State v. Strode*, 232 S.W.3d 1, 8 (Tenn. 2007). A trial court's findings of fact are binding on this court unless the evidence preponderates against those findings. *Id.* The trial court's application of the law to those facts is reviewed de novo. *Id.*

### 1. Significantly Subaverage General Intellectual Functioning

Regarding "[s]ignificantly subaverage general intellectual functioning" under section 39-13-203(a)(1), the Tennessee Supreme Court previously held in *Howell* that the demarcation of an I.Q. score of 70 was a "bright-line" rule that must be met. *Howell*, 151 S.W.3d at 456-59. The court also held that the statutory provision should not be interpreted to allow for a standard error of measurement or any other circumstance whereby an individual with an I.Q. above 70 could be considered intellectually disabled. *Id.* at 457-58.

On April 11, 2011, the Tennessee Supreme Court concluded that although an individual's I.Q. is generally obtained through standardized intelligence tests, section 39-13-203 does not provide clear direction regarding how an I.Q. should be determined and does not specify any particular test or testing method that should be utilized. *Coleman v. State*, 341 S.W.3d 221, 241 (Tenn. 2011). The court noted that section 39-13-203(a)(1) requires a "functional intelligence quotient of seventy (70) or below" and does not require

-41-

a "functional intelligence quotient test score of seventy (70) or below." *Id.* (emphasis in original). Therefore, "the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." *Id.*

The supreme court noted that section 39-13-203(a)(1) differs with clinical practice in one material respect. *Id.* at 247. In diagnosing intellectual disability, clinicians generally report their conclusions regarding an individual's I.Q. within a range, and section 39-13-203(a)(1) requires more definite testimony. *Id.* As a result, "an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." *Id.* at 242.

In determining whether a defendant's functional I.Q. is 70 or below, "a trial court should consider all evidence that is admissible under the rules for expert testimony." *Keen v. State*, 398 S.W.3d 594, 605 (Tenn. 2012). Experts may use relevant and reliable practices, methods, standards, and data in formulating their opinions. *Coleman*, 341 S.W.3d at 242. Moreover,

> if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

*Id.* at n.55. The emphasis to be placed upon clinical judgment varies depending upon "the type and amount of information available, the complexity of the issue, and the presence of one or more challenging conditions or situations." *Id.* at 246. The trial court is not required to follow any particular expert's opinion but must fully and fairly consider all evidence presented, including the results of all I.Q. tests administered to the defendant. *Id.* at 242.

Therefore, pursuant to *Coleman*, "a trial court may accept the opinion of an expert that a defendant's I.Q. is 70 or below based upon the application of the Flynn Effect even though the defendant received an I.Q. score of 75 on the applicable test." *Michael Wayne Howell v. State*, No. W2009-02426-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 447, at *39 (Tenn. Crim. App., at Jackson, June 14, 2011), *perm. app. denied* (Tenn. June 9, 2013). The application of the Flynn Effect or the standard error of measurement, however, is not required. *Coleman*, 341 S.W.3d at 242 n.55; *Michael Wayne Howell*, 2011 Tenn. Crim. App.

LEXIS 447, at *39. As a result, a trial court "may reject the application of the Flynn Effect to adjust I.Q. scores based upon evidence of its lack of validity and consider the I.Q. score of 75 as the defendant's functional I.Q." *Id.*

On October 8, 2013, the Tennessee Supreme Court released its opinion in *State v. Pruitt*, 415 S.W.3d 180 (Tenn. 2013), further clarifying its opinion in *Coleman*. Pruitt presented testimony from Dr. Rebecca Rutledge, who assessed Pruitt in November 1996 when Pruitt was sixteen years old at the request of juvenile court. *Pruitt*, 415 S.W.3d at 194. Pruitt received an I.Q. score of 66 on the Slosson Intelligence Scale, which Dr. Rutledge said fell within the mildly intellectually disabled range. *Id.* at 195. Dr. Rutledge said that Pruitt did not appear to have taken the testing seriously and that his test results may have been slightly lower than his actual level of cognitive functioning. *Id.* She stated that Pruitt would have continued to test in the mildly intellectually disabled range had he put forth more effort. *Id.*

Dr. Rutledge also reviewed a report from the Middle Tennessee Mental Health Institute ("MTMHI") from a September 2006 evaluation of Pruitt which reflected a diagnosis of mildly intellectually disabled. *Id.* While Dr. Rutledge acknowledged that the WAIS test is the "gold standard" for I.Q. testing, she said Pruitt would have "fallen pretty close" to his score on the Slosson test had he taken the WAIS test in 1996. *Id.*

The State presented the testimony of Dr. Sam Craddock, who evaluated Pruitt in 2006 at MTMHI. *Id.* at 198. Dr. Craddock testified that the report of the evaluation erroneously stated that Pruitt was diagnosed as mildly intellectually disabled. *Id.* at 199. He said the correct diagnosis was "borderline intellectual functioning." *Id.* Pruitt received an I.Q. score of 68 on a test administered by Dr. Craddock. *Id.* Dr. Craddock said the report stated that Pruitt appeared to make good effort on the test "[w]ith the exception of him occasionally giving quick responses with accompanying little thought." *Id.* As a result, he believed Pruitt's I.Q. was higher than his scores reflected. Other factors that led Dr. Craddock to conclude that Pruitt's score was indicative of intellectual disability included his score on the Beta test and his school records. *Id.* The trial court found that Pruitt failed to prove by a preponderance of the evidence that he had significantly subaverage intellectual functioning as evidenced by an I.Q. of 70 or below. *Id.* at 200.

The Tennessee Supreme Court first noted that Pruitt's raw I.Q. test scores were below 70. *Id.* at 202. The court further noted that although both experts stated that Pruitt may not have given his best effort on the tests, neither expert testified that Pruitt's I.Q. would have been higher than 70 had his effort been greater. *Id.* at 203. Moreover, neither expert testified that Pruitt's test scores were "unreliable." *Id.* The court explained, "Although the scores in this case were called into question by the trial court, neither expert opined that Mr. Pruitt's

I.Q. was greater than seventy, whether through lack of effort or on some other basis for adjustment of the raw score. Neither expert testified that the tests had an element of unreliability in their administration." *Id.* "In the absence of expert testimony that his I.Q. was above seventy," the court held that the evidence preponderated against the trial court's finding that Pruitt failed to establish significantly subaverage general intellectual functioning as evidence by a functional I.Q. of 70 or below. *Id.*

In the present case, the defendant's raw I.Q. scores were all above seventy. Therefore, to establish that he had significantly subaverage general intellectual functioning as provided in Tennessee Code Annotated section 39-13-203(a)(1), the defendant must present evidence that the raw I.Q. scores or the method of testing was unreliable and that his functional I.Q. is seventy or below. *See id.* at 202-03; *Coleman*, 341 S.W.3d at 242. Dr. Hutson testified that the defendant's full-scale I.Q. score of 77 had a margin of error of plus or minus seven points, resulting in an I.Q. range of 70 to 84. Dr. Hutson, however, did not testify that the application of the margin of error resulted in the defendant's functional I.Q. equaling seventy or below. Rather, he concluded that the defendant is not intellectually disabled and falls within the borderline range.

The defendant asserts that because the I.Q. range included an I.Q. score of 70, he met the first prong of the statute. The supreme court in *Coleman* stated that section 39-13-203(a)(1) requires experts to provide "definite testimony" regarding a defendant's functional I.Q. *Coleman*, 341 S.W.3d at 247. Experts must testify "to a specific score" or at least that the defendant's functional I.Q. "is either 'seventy (70) or below' or above seventy." *Id.* Dr. Hutson offered no testimony that based on his consideration of the margin of error, the defendant's functional I.Q. is seventy or below. The defendant, therefore, failed to establish that he had significantly subaverage general intellectual functioning as provided in section 39-13-203(a)(1).

## 2. Deficits in Adaptive Behavior

To establish intellectual disability, a defendant also must establish "[d]eficits in adaptive behavior." Tenn. Code Ann. § 39-13-203(a)(2). "Deficits in adaptive behavior" refer to the inability of an individual to adapt to surrounding circumstances. *State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994). The accepted clinical definition of adaptive functions requires that an intellectually disabled person have "significant limitations in at least two of the following basic skills: 'communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Van Tran*, 66 S.W.3d at 795 (quoting *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 39 (4th ed. 1994)).

In this case, little evidence was presented concerning the defendant's adaptive behavior. Dr. Hutson testified that he did not conduct any formal adaptive function testing, and he did not identify any areas of adaptive functions in which the defendant had significant limitations. Therefore, the defendant failed to establish deficits in adaptive behavior as required by section 39-13-203(a)(2).

### 3. Manifestation Before the Age of Eighteen

Finally, the defendant must prove that his intellectual disability manifested during his developmental period or by the age of eighteen. Tenn. Code Ann. § 39-13-203(a)(3). The defendant did not establish by a preponderance of the evidence that he had significantly subaverage general intellectual functioning or deficits in adaptive behavior. Thus, he has not demonstrated that he had an intellectual disability that manifested during his developmental period or before the age of eighteen. Because the defendant has failed to establish all three prongs of section 39-13-203(a), he is not entitled to relief regarding this issue.

## II. SUFFICIENCY

The defendant asserts that the evidence is insufficient to support his convictions. Specifically, he asserts that the evidence is insufficient to establish his identity as the perpetrator and that he raped or sexually assaulted the victim.

A guilty verdict shall be set aside if the evidence is insufficient to support the jury's findings of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). When considering the sufficiency of the evidence, "the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007) (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). The relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e). A verdict of guilt removes the presumption of innocence and raises a presumption of guilt, and the defendant bears the burden of establishing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A criminal offense may be established exclusively be circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). The jury must determine the significance of the circumstantial evidence, the inferences to be drawn from the evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Appellate courts may not substitute their own

inferences for those drawn by the jury in circumstantial evidence cases. *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The Tennessee Supreme Court has abolished any distinction between the standard of proof required in cases based solely upon circumstantial evidence and in cases where direct evidence of guilt is presented by the State. *Dorantes*, 331 S.W.3d at 381. Therefore, our standard of review is identical regardless of whether the conviction is based upon direct or circumstantial evidence. *Id.* at 379.

## A. Identity

The defendant contends that the evidence was insufficient to establish his identity as the perpetrator. The identity of the perpetrator is an essential element of any criminal offense. *Rice*, 184 S.W.3d at 662. The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

When viewed in a light most favorable to the State, the evidence presented at trial established that the defendant was in the area of the victim's house at the time of the murder, had a lighter that resembled a gun, forced the victim out of her house and into a wooded area behind her home, engaged in sexual activity with the victim, left a condom with his DNA at the crime scene, and killed the victim by strangling her and striking her head. According to the evidence presented at trial, the defendant came to the victim's house before noon on June 1, 2010, to receive his wages. Ray Horne testified that after Rick Adam Harris paid the defendant, the defendant counted his money and discovered that his wages were less than what he generally received. The defendant questioned others regarding the reason that his wages were less, and Mr. Horne reminded him that he had been absent from work one day. The defendant continued to ask to speak to Rick Harris, but Rick did not come outside.

The defendant admitted that he returned to the victim's home later that day and that Rick was not there. Andrew Reddick testified that after speaking to the defendant, he saw the defendant approach the Harris home and knock on the door. Andrew saw the victim come to the door and speak to the defendant for approximately ten seconds. Andrew then saw the defendant enter the home. The defendant told the victim that he had a question regarding his wages. The victim called Rick, and the defendant spoke to him regarding the pay discrepancy. The call occurred at 1:10 p.m. and lasted one minute and two seconds.

Multiple witnesses testified that they last communicated with the victim between 1:00 and 1:30 p.m. Kelly Phelps said she spoke to the victim a few minutes before 1:00 p.m. regarding a job site. Alexia Block and the victim exchanged text messages between 1:02 and 1:28 p.m. The last text message sent by the victim was at 1:25 p.m. Johnnie Phelps called the victim's land line and spoke with her at 1:30 p.m. No one communicated with the victim

after Mr. Phelps' call. No one answered the door when Mr. Plunk delivered a package to the victim's home at 2:16 p.m.

The defendant was seen in the area of the victim's home at approximately 1:30 p.m. Tommy Redditt testified that at around 1:30 p.m., he saw an African-American man, who he recognized as one of Rick's employees, standing near a trailer and looking at the victim's home and his surroundings. Tommy also saw the man in the area at approximately 1:00 p.m.

The defendant argues that based upon Ms. Bell's testimony that he was at home when she returned from work at 2:00 p.m., he would have had less than thirty minutes to commit the offenses. The defendant contends that he would not have been able to commit the offenses and then return home in this period of time especially in light of Special Agent Sullivan's testimony that it took him seven minutes and thirty seconds to walk the path in the woods from the Harris residence to the defendant's home. The defendant, however, informed officers that Ms. Bell arrived home between 2:30 and 2:50 p.m. Mr. Sisco also testified that there was a shortcut through the woods from the area where the victim's body was found to an area near the defendant's house. Mr. Sisco said it would only take thirty seconds to run the route.

Agents discovered a lighter in the shape of a handgun near the location of the victim's body. Ms. Bell identified a gun-shaped lighter in a photograph as belonging to her son, Kevin. A partial DNA profile matching the defendant's DNA was obtained from the lighter. A condom with the defendant's DNA was found near the lighter. A trail of disturbed leaves led from the area where the lighter and condom were found to the location of the victim's body. It appeared that something had been drug from the location of the lighter and the condom to the location of the victim's body. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish the defendant as the perpetrator of the offenses.

### B. Killing During Rape

The defendant next contends that the evidence is insufficient to prove that the killing was committed during the perpetration of a rape, as to support his conviction for felony murder. To obtain a conviction for felony murder, the State was required to prove: (1) a killing of another; (2) committed during the perpetration of a rape. Tenn. Code Ann. § 39-13-202(a)(2). Rape is defined as:

Unlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances:

(1)  Force or coercion is used to accomplish the act;

(2)  The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent. . . .

Tenn. Code Ann. § 39-13-503(a).

The defendant used a lighter in the shape of a gun to force the victim into the woods. The victim was found with her shirt ripped open, her bra rolled down to her waist, and her chest exposed.  Her underwear was rolled above her pants line, and her shorts were pulled higher than her waist.  A condom was found in an area near the victim's body, and a print in the shape of human buttocks was in the ground near the condom.  Semen on the condom matched the defendant's DNA.  Dr. Funte found that the victim had signs of sexually related trauma, including blunt force injuries to her inner thighs.  This evidence, when viewed in a light most favorable to the State, is sufficient to establish that the killing of the victim was committed during the perpetration of a rape.

## C.  Aggravated Sexual Battery

Aggravated sexual battery is defined as:

unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1)  Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;  [or]

(2)  The defendant causes bodily injury to the victim. . . .

Tenn. Code Ann. § 39-13-504(a).  "Sexual contact" is defined as including "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonablly construed as being for the purpose of sexual arousal or gratification."  Tenn. Code Ann. § 39-13-501(6).  "Intimate parts" include "the primary genital area, groin, inner thigh, buttock or breast of a human being."  *Id.* at (2).

Evidence supporting the conviction for felony murder in the perpetration of a rape also is sufficient to establish aggravated sexual battery.  Dr. Funte's testimony, the photographs

of the victim's body, the disarray of the victim's clothing, and the defendant's DNA found on the condom at the crime scene are sufficient to establish that sexual contact occurred. The defendant is not entitled to relief regarding this issue.

## III. DENIAL OF MOTION FOR MISTRIAL

The defendant submits that the trial court erred in denying his motion for a mistrial during the testimony of Ms. Bell and Rick Harris. According to the defendant, Ms. Bell and Rick Harris improperly testified regarding his prior incarceration.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. *State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

### A. Ms. Bell's Testimony

The State called Ms. Bell as its second witness at trial. During the State's direct examination, the following exchange occurred:

Q. Now, in June of 2010, and listen carefully to my question. In June of 2010 how long had [the defendant] lived there? When had he moved in with you before June of 2010?

A. Well, he came---he came to me in February after--after--after prison, in February the 20th.

Q. Okay. So he came to you in February of 2010, correct?

A. Uh-huh.

Q. Now, he had lived at that address as a young man?

A. Yeah.

Q. And what ages had he lived at that same address?

A. Well, ever since he was--well, not ever since, but since he was like three years old, at that that address.

Defense counsel requested a bench conference and moved for a mistrial, arguing that the State's question was designed to elicit a response regarding the defendant's criminal history. The prosecutor stated that he did not intend to elicit such a response and that he was surprised by the answer. The trial court agreed that the State's question was not worded in a way to solicit a response regarding the defendant's criminal history. Rather, the trial court stated that the State was allowed to question Ms. Bell to establish the defendant's familiarity with the neighborhood. The trial court found that Ms. Bell's testimony was not responsive to the question asked. Defense counsel also argued that the jury could find that the defendant had been in juvenile facilities and prison for a substantial amount of time based upon Ms. Bell's testimony that he had lived at home since the age of three. The trial court stated it "didn't get that" out of the question or the answer.

The trial court denied the defendant's motion for a mistrial and offered to give the jury a curative instruction. Defense counsel argued that a curative instruction would further "highlight" the comment and asked that the trial court not give such an instruction. The trial court cautioned the prosecutor regarding the wording of his questions. The court also told Ms. Bell to respond to the question asked and to not mention the defendant's prior jail sentence.

We cannot conclude that Ms. Bell's testimony created a "manifest necessity" for a mistrial. The record does not reflect that the prosecutor deliberately elicited the testimony in order to create an inference of guilt on the part of the defendant. Rather, the State's questions were designed to establish the defendant's familiarity with the area. The record also does not reflect that the prosecutor anticipated Ms. Bell's answer. Ms. Bell's answer was not responsive to the State's question regarding the time period during which the defendant lived with her. *See State v. Smith*, 755 S.W.2d 757, 766 (Tenn. 1998) (holding that the trial court did not err in denying the defendant's motion for a mistrial when there was no indication that the State "intended or anticipated that the witness would mention that the defendant had been in jail"). The trial court did not offer a curative instruction to the jury because defense counsel requested that the court not do so. Finally, the State's case against the defendant was strong such that the jury would have convicted the defendant in the absence of the improper testimony. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

**B. Rick Harris' Testimony**

The following exchange occurred during the State's direct examination of Rick Harris:

Q. Okay. Now, back in June of 2010 did you know [the defendant]?

A. Yes, sir.

Q. And how did you know him?

A. His brothers had actually worked for me once or twice, and I knew his-- well, I met his mom once, but I knew him from around the corner. And my son came to me and told me that he was, you know, just got out of jail--

The defendant objected and requested a mistrial. The State argued that Rick did not respond to the question asked and requested that they be allowed to address Rick outside of the presence of the jury. The trial court denied the defendant's motion for a mistrial. The trial court instructed the jury: "Ladies and gentlemen, again, the last question and response to it, I ask you just ignore it entirely. Put it out of your mind." The prosecutor then questioned Rick outside the jury's presence, during which the prosecutor admonished Rick to only respond to the question asked and to refrain from referring to the defendant's criminal history.

The record does not reflect that the prosecutor deliberately elicited the testimony in order to create an inference of guilt on the part of the defendant or that the prosecutor anticipated Rick's answer. Rick's answer was not responsive to the State's question. The trial court also gave a curative instruction, which we must presume that the jury followed. *See State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). Finally, the State's case against the defendant was strong such that the jury would have convicted the defendant in the absence of the improper testimony. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

## IV. EVIDENCE OF RICK HARRIS' EXTRAMARITAL AFFAIR

Defense counsel sought to question Rick Harris on cross-examination regarding his extramarital affair with his former wife, Rebecca Harris, at the time of the victim's death. The State objected and argued that the evidence was irrelevant. Defense counsel asserted that the affair was relevant for impeachment purposes and as evidence of motive to either kill the victim or have her killed.

During a jury out hearing, defense counsel questioned Rick regarding the affair. Rick testified that the extramarital affair with Ms. Harris began in November of 2009 and that they engaged in sexual intercourse on five occasions. Their second sexual encounter occurred in the Frayser area of Memphis. As a result, they referred to their sexual encounters as "Frayser[s]." Rick admitted that he sent Ms. Harris four text messages on the afternoon of June 1st. Rick told Ms. Harris that he wanted a drink, dinner, and a "Frayser." On the afternoon of June 1st, Rick called the victim, but the victim did not answer. Rick denied wanting to get back together with Ms. Harris and said their relationship was only sexual in nature.

On cross-examination, Rick testified that he informed law enforcement officers of the affair and that he did not attempt to hide the affair from them. Upon further questioning by defense counsel, Rick said that when Special Agent Sullivan questioned him on June 2nd, Rick told him about the affair. Rick explained that he was open about the affair because he did not want officers to suspect him based upon the affair and wanted officers to catch the actual killer. He acknowledged that information regarding the affair was not included in his written statement. He said he did not tell officers about the affair when questioned a second time on July 2nd because he previously informed them of the affair on June 2nd.

The trial court disallowed the evidence, stating:

The Rules require that proof of another wrong or act has to go to credibility. It's not just . . . bad conduct, but to truthfulness or untruthfulness.

And the Court doesn't believe this line of questioning, while the Court acknowledges it's conduct that might involve moral turpitude or certainly inappropriate conduct, does not go to truthfulness or untruthfulness or would aid the jury really in any way in determining the credibility of the witness. So the Court will sustain the objection with regard to this line or questioning.

With regard to the defendant's argument that the affair was evidence of motive, the trial court stated:

[Rick Harris] is not a criminal defendant. So you can certainly ask him the other questions that have to do with whether he committed a crime, whether he committed this crime, any of those type of questions.

The defendant asserts that the trial court erred in refusing to allow defense counsel to question Rick Harris regarding his affair with Ms. Harris. We review trial court decisions concerning the admissibility of evidence under an abuse of discretion standard. *State v.*

*Robinson,* 146 S.W.3d 469, 490 (Tenn. 2004). A trial court does not abuse its discretion unless it applies an incorrect legal standard or reaches an illogical decision that causes an injustice to the complaining party. *Id.*

The defendant submits that evidence of Rick's extramarital affair with Ms. Harris was relevant to impeach Rick's credibility. "Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness" may be inquired into on cross-examination if "the alleged conduct has probative value and [ ] a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b). "Evidence of non-commercial, non-felonious and private sex acts will not impeach or discredit a witness's testimony and such evidence is not admissible for that purpose." *Walden v. State*, 542 S.W.2d 635, 637 (Tenn. Crim. App. 1976); *see also Anthony Bull v. William Fey*, 1988 Tenn. App. LEXIS 405, at *6 (Tenn. App. July 13, 1988) (holding that the fact that a person is involved in an extramarital affair is not probative of the person's truthfulness or untruthfulness under Rule 608(b)).

The defendant also sought to present evidence of the affair to establish that Rick Harris had a motive to kill the victim. Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to present a defense, and this right is "a fundamental element of due process of law." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)); *see Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). A defendant is entitled to present evidence implicating others in the crime. *State v. Powers*, 101 S.W.3d 383, 394 (Tenn. 2003).

In *Powers*, the Tennessee Supreme Court addressed the standard for determining the admissibility of evidence of a third party defendant. *Id.* at 394-95. The court rejected the "direct connection" test, which required that the evidence "directly connect the third party with the substance of the crime and . . . clearly point out someone besides the accused as the guilty person in order to be admissible." *Id.* at 395. The court held that the threshold imposed by the "direct connection test" was too high. *Id.* The court further held that the Rules of Evidence are adequate to determine the admissibility of evidence regarding third party culpability.

At trial, defense counsel characterized Rick Harris' extramarital affair as a "prior bad act." The trial court rejected the defendant's argument, stating that Rick Harris was not a defendant. Rule 404(b) of the Tennessee Rules of Evidence, which addresses prior bad acts of a defendant, does not apply when a third-party defense is raised. *State v. Rogers*, 188 S.W.3d 593, 612-13 (Tenn. 2006). "'[E]vidence of crimes, wrongs or acts, if relevant, is not excluded by Rule 404(b) if the acts were committed by a person other than the accused.'"

*State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002) (quoting *State v. Dubose*, 953 S.W.2d 649, 653 (Tenn. 1997)).  Accordingly, the trial court correctly declined to analyze evidence of Rick Harris' affair under the standards set forth in Rule 404(b).

The trial court, however, failed to analyze the admissibility of the evidence under the general relevancy standards provided in Rules 401 and 403.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by the considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.  "Evidence that a third party had the motive and opportunity to commit the offense has been deemed relevant to a criminal prosecution."  *Rice*, 184 S.W.3d at 672.

One of the defendant's theories of defense was that Rick Harris committed the offenses. Defense counsel questioned law enforcement officers regarding their investigation of Rick.  Evidence was presented that a struggle occurred, that the woods where the victim's body was found had thick brush, that Rick had cuts on his hand, and that his DNA was found on the victim.  The defendant also attempted to challenge Rick's alibi by questioning witnesses regarding whether they maintained contact with Rick during the entire time that they were at Munford Tires.  The question is whether evidence of Rick's extramarital affair at the time of the victim's murder makes "any fact that is of consequence . . . more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401; *see Rice*, 184 S.W.3d at 672.  This court previously has recognized that evidence that a defendant was involved in an extramarital affair at the time of his wife's murder indicated that there was trouble in the defendant's marriage to the victim and suggested a motive for the murder.  *State v. Brock*, 327 S.W.3d 645, 704 (Tenn. Crim. App. 2009).  Evidence that Rick was involved in an extramarital affair at the time of the victim's murder is relevant as it tends to make the fact of his involvement in the crime more probable than it would be without the evidence.  This evidence was not substantially outweighed by risk of unfair prejudice, confusion of issues, possible misleading of the jury, or waste of time.  Accordingly, the trial court erred in excluding the evidence.

The defendant argues that the trial court's exclusion of the evidence deprived him of his due process right to present a meaningful defense.  An evidentiary ruling generally does not rise to the level of a constitutional violation.  *Rice*, 184 S.W.3d at 647; *see Crane*, 476 U.S. at 689 ("We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts.").  In determining whether the constitutional right to present a defense has been violated by the exclusion of evidence,

a court should consider whether: (1) the excluded evidence is critical to the defense; (2) the excluded evidence bears sufficient indicia of reliability; and (3) the interest supporting the exclusion is substantially important. *Powers*, 101 S.W.3d at 397.

In *Chambers*, the defendant was not allowed to introduce evidence that a third party had confessed to the crime, and the United States Supreme Court held that the exclusion of the "critical" evidence denied the defendant a trial in accordance with due process standards. *Chambers*, 410 U.S. at 302. Evidence of Rick Harris' extramarital affair, however, falls far short of the critical evidence considered in *Chambers*. Multiple witnesses testified at trial that they were with Rick around the time of the victim's murder. Special Agent Sullivan testified that the scratches on Rick were consistent with those obtained while working in the yard. Rick explained that his DNA was on the victim because they had engaged in sexual intercourse the night before the victim's murder. Moreover, no evidence was presented at trial suggesting that Rick had someone commit the crimes for him.

The defendant argues that the evidence was critical in order to impeach Rick's testimony. According to the defendant, Rick's "omissions of details to police regarding his extramarital affair with Rebecca Harris call into question his credibility." Rick, however, testified during the jury out hearing that he told police of the extramarital affair during his initial interview with them. Moreover, while Rick testified at trial that he did not call the victim on the afternoon of her murder because he was too busy working, he acknowledged that he sent four text messages to Rebecca Harris, none of which were work-related.

Considering the strength of the State's evidence against the defendant and the relatively weak probative value of the evidence sought to be introduced by the defendant, we conclude that the error was harmless beyond a reasonable doubt. *See Rice*, 184 S.W.3d 673-74 (holding that the trial court's error in not allowing the defendant to present evidence of third party culpability to be harmless beyond a reasonable doubt); *see also Powers*, 101 S.W.3d at 397 (concluding there was no due process violation from the denial of evidence that someone had seen the victim and her husband the night before she disappeared, that the victim was shaking and attempting to hide from her husband, and that that the victim's husband later denied being with the victim on that night). The defendant is not entitled to relief regarding this issue.

## V. CONSTITUTIONALITY OF THE (i)(7) AGGRAVATOR

The defendant contends that the felony murder aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(7) is unconstitutional. The defendant, however, did not raise this issue in the trial court. Therefore, the issue is waived. *See* Tenn. R. App. P. 36(a).

Notwithstanding waiver, the defendant is not entitled to relief. In *State v. Middlebrooks*, 840 S.W.2d 317, 346 (Tenn. 1992), the Tennessee Supreme Court held that the then existing felony murder aggravating circumstance essentially duplicated the elements of the criminal offense of felony murder and failed to sufficiently narrow the class of convicted defendants eligible for the death penalty. The (i)(7) aggravating circumstance subsequently was amended to state that the murder "was knowingly committed, solicited, directed or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit" one of the specified felonies. Tenn. Code Ann. § 39-13-204(i)(7) (Supp. 1995). The defendant argues that while this amendment "slightly narrow[s] the class of those defendants eligible for the death penalty, there still exists a disproportionate risk of a death sentence for those convicted of felony murder rather than those convicted of premeditated murder, making the statute constitutionally inadequate." The Tennessee Supreme Court, however, has upheld the (i)(7) aggravating circumstance, as amended, as constitutional. *State v. Stout*, 46 S.W.3d 689, 706 (Tenn. 2001).

## VI. PROPORTIONALITY AND THE ABSENCE OF INTENT TO KILL

The defendant submits that the absence of intent to kill should render the death penalty disproportionate. The defendant essentially challenges the constitutionality of the death penalty as punishment for felony murder. The Tennessee Supreme Court recently rejected the claim that the death penalty is categorically disproportionate for a person who lacked an intent to kill during a felony. *Pruitt*, 415 S.W.3d at 212. Rather, we must consider the "'absence or presence of premeditation,'" including "all other degree of culpability less than premeditation," in identifying similar cases for comparison. *Id.* at 217 (quoting *State v. Bland*, 958 S.W.2d 651, 667 (Tenn. 1997)).

## VII. MODIFICATION OF PROPORTIONALITY REVIEW

The defendant asserts that the comparative proportionality review adopted in *Bland*, 958 S.W.2d 651, "is flawed and unreliable, and as such, produces an unconstitutionally flawed result." The defendant seeks to modify proportionality review to broaden the pool of cases to be considered. The Tennessee Supreme Court recently rejected this claim and affirmed the comparative proportionality review adopted in *Bland*. *Pruitt*, 415 S.W.3d at 217.

## VIII. MANDATORY REVIEW

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tennessee Code Annotated section 39-13-206(c)(1) requires this court to review

the record to determine whether:

> (A) The sentence of death was imposed in any arbitrary fashion;
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

### A. Manner in Which Death Sentence Was Imposed

The death penalty is not imposed in an arbitrary fashion if the defendant's trial "was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure." *Young*, 196 S.W.3d at 115. The defendant contends that the trial court improperly denied the State and the defense the opportunity to present closing arguments at the conclusion of the proof during the penalty phase rather than mandating that they do so. According to the defendant, Tennessee Code Annotated section 39-13-204(d) mandates that both parties present closing argument during the penalty phase of a capital trial.

Section 39-13-204(d) provides that "[i]n the sentencing proceeding, the state shall be allowed to make a closing argument to the jury; and then the attorney for the defendant shall also be allowed such argument, with the state having the right of closing." This statute does not mandate that the parties make closing arguments during the penalty phase. Rather, the statute requires the trial court to provide the parties with the opportunity to do so.

After the defendant presented his proof, the trial court asked each party whether they wanted to present anything more. Both parties responded that they did not. The trial court then instructed the jury, and neither the State nor the defendant objected. The trial court allowed each party the opportunity to present a closing argument, and both parties declined. Therefore, the trial court properly followed the procedure set forth in section 39-13-240(d).

In accordance with the trial court's instructions, the jury unanimously determined that the State proved beyond a reasonable doubt that several aggravating circumstances applied to the murder committed by the defendant and that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The record reveals that the sentencing hearing was conducted pursuant to the applicable statutory provisions and the rules of criminal procedure. We conclude that the defendant's sentence of death was not

imposed in an arbitrary fashion.

## B. Evidence Supporting Aggravating Circumstances

In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, we must determine, after viewing the evidence in the light most favorable to the State, whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006). In sentencing the defendant to death for the felony murder of the victim, the jury applied four aggravating circumstances:

> 1. The defendant was previously convicted of one (1) or more felonies other than the present charge whose statutory elements involve the use of violence to the person;
>
> 2. The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death;
>
> 3. The murder was knowingly committed by the defendant, while the defendant had a substantial role in committing kidnapping of [the victim];
>
> 4. The murder was knowingly committed by the defendant, while the defendant had a substantial role in committing or attempting to commit the rape of [the victim].

*See* Tenn. Code Ann. § 39-13-204(i)(2), (5), (7).

### a. (i)(2): Prior Violent Felony Conviction

The jury found that aggravating circumstance (i)(2) applied, which requires that "the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2). The State presented evidence that the defendant was convicted of robbery of a motor vehicle and aggravated assault in Pennsylvania in 1997. No evidence was presented regarding the facts of the prior convictions. The trial court instructed the jury that the State was relying upon the (i)(2) aggravating circumstance but did not identify the prior convictions upon which the State was relying and did not state that the convictions were felonies involving the use of violence to the person.

In *State v. Sims*, 45 S.W.3d 1, 11-12 (Tenn. 2001), the Tennessee Supreme Court held

that whether the statutory elements of an offense involve the use of violence to the person must be determined by the trial court and not the jury. In *Sims*, the State presented evidence of two prior convictions for aggravated assault to establish the prior violence felony aggravating circumstance. The court recognized that the statutory elements of aggravated assault do not necessarily involve the use of violence. *Sims*, 45 S.W.3d at 11-12. The court noted that aggravated assault may be committed by actual violence or by knowingly causing the victim to reasonably fear imminent bodily injury by use or display of a deadly weapon. *Id.* The court approved a procedure in which the trial judge, outside the presence of the jury, determines whether the elements of that offense involved the use of violence to the person. *Id.* If the trial court determines that the statutory elements of the prior offense involve the use of violence, the State then may present evidence that the defendant previously had been convicted of that prior offense. *Id.* The trial court then would instruct the jury that the prior conviction involved the use of violence to the person. *Rice*, 184 S.W.3d at 669.

The trial court must conduct a *Sims* hearing when the statutory elements of the prior felony do not necessarily involve the use of violence to the person. *Id.* The scope of the trial court's inquiry is limited to "reliable judicial records" regarding the prior conviction, and the trial court may not reexamine the facts underlying that conviction. *Id.* Judicial records that the trial court may examine include "the charging documents, jury instructions, plea agreements or transcripts of the colloquy between judge and defendant in which the defendant confirms the factual basis for the plea, or bench-trial judges' findings of fact and rulings of law." *Id.* If it is still unclear whether the prior conviction involved the use of violence to the person, it would then become a determination for the jury. *Id.*

The Pennsylvania statute defining "robbery of motor vehicle" provides that "[a] person commits a felony of the first degree if he steals or takes a motor vehicle from another person in the presence of that person or any other person in lawful possession of the motor vehicle." 18 Pa.C.S. § 3702. Pennsylvania courts have interpreted this statute to require that the taking of the motor vehicle be accomplished by "the use of force, intimidation, or the inducement of fear in the victim." *Commonwealth v. George*, 705 A.2d 916, 920 (Pa. Super. 1998). Robbery of a motor vehicle may be accomplished by use of force or by intimidation or inducement of fear. Accordingly, the statutory elements of robbery of a motor vehicle do not necessarily involve the use of violence.

The Pennsylvania statute defining "aggravated assault" as it appeared in 1997 provided that a person commits aggravated assault if he or she:

> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

(2) attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) or to an employee of an agency, company or other entity engaged in public transportation, while in the performance of duty;

(3) attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c), in the performance of duty;

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon;

(5) attempts to cause or intentionally or knowingly causes bodily injury to a teaching staff member, school board member, other employee or student of any elementary or secondary publicly-funded educational institution, any elementary or secondary private school licensed by the Department of Education or any elementary or secondary parochial school while acting in the scope of his or her employment or because of his or her employment relationship to the school; or

(6) attempts by physical menace to put any of the officers, agents, employees or other persons enumerated in subsection (c), while in the performance of duty, in fear of imminent serious bodily injury.

18 Pa.C.S. § 2702(A) (1997). The judgment entered in the defendant's trial does not specify under which subsection that the defendant was convicted. We note that "F1" is handwritten on the judgment beside the notation that the defendant was convicted of aggravated assault. Aggravated assault under subsection (A)(1) and (2) is a felony of the first degree, while aggravated assaulted under subsection (A)(3), (4), (5), and (6) is a felony of the second degree. Even if the defendant was convicted of aggravated assault as a felony of the first degree under subsection (A)(1) or (2), we conclude that the statutory elements of aggravated assault under these subsections do not necessarily involve the use of violence. Recklessly causing serious bodily injury to another does not necessarily require the use of violence. *See State v. Fierro*, 804 P.2d 72, 83 n.9 (Ariz. 1990) (noting that committing aggravated assault by recklessly causing serious bodily injury does not necessarily require the use or threatened use of violence and, therefore, does not constitute a prior felony conviction that by statutory definition involves the "use of or threat of violence on another person" and may not be relied upon in establishing the prior violence felony aggravating circumstance).

Because the statutory elements of the defendant's prior convictions did not necessarily involve the use of violence to a person, the trial court was required to conduct a *Sims* hearing. However, the trial court failed to do so. No determination was made as to whether the elements of the prior convictions involved the use of violence to the person, and no evidence was presented to the trial court or the jury regarding the underlying facts of the offenses. As a result, there is no evidence in the record to support a finding that the defendant's prior convictions for aggravated assault and robbery of a motor vehicle involved the use of violence to the person. *See Rice*, 184 S.W.3d at 667 (holding that because the trial court failed to follow the procedures in *Sims* regarding the defendant's prior aggravated assault conviction, the evidence was insufficient to establish the (i)(2) aggravating circumstance).

We note that the defendant did not object at trial to the use of his prior convictions. We, however, are required to review the sufficiency of the evidence supporting the aggravating circumstances found by the jury in all capital cases. *See* Tenn. Code Ann. § 39-13-206. Accordingly, the defendant's failure to object did not result in waiver. *See Rice*, 184 S.W.3d at 667. Because the trial court failed to conduct the analysis of the underlying convictions required under *Sims*, the evidence was insufficient to establish that the defendant had been previously convicted of a felony whose statutory elements included the use of violence against a person.

### b. (i)(5): Heinous, Atrocious, or Cruel

The jury found that the victim's murder was "especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). This aggravating circumstance may be applied if the evidence is sufficient to support *either* torture *or* serious physical abuse beyond that necessary to produce death. The evidence established that the victim was strangled and severely beaten and that the number and severity of the wounds were more than necessary to cause death. The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

### c. (i)(7): Felony Murder

The jury found that the defendant knowingly committed the victim's murder, while the defendant had a substantial role in committing the kidnapping of the victim. *See* Tenn. Code Ann. § 39-13-204(i)(7). The jury found as a separate aggravating circumstance that the defendant knowingly committed the victim's murder, while the defendant had a substantial role in committing or attempting to commit rape of the victim. *See id.*

The aggravating circumstance in subsection (i)(7) may be applied if:

[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

The evidence presented at trial established that the defendant committed the murder while committing kidnapping and committing or attempting to commit rape. Subsection (i)(7), however, does not include any language that appears to allow the State, the trial court, and the jury to treat this single aggravating circumstance as multiple and separate aggravating circumstances based upon the number of felonies committed. The Tennessee Supreme Court has treated the fact that a murder was committed during the course of multiple felonies as a single aggravating circumstance and has held that a trial court, in charging the jury on this aggravating circumstance, must limit the instruction to only those felonies that are raised by the evidence. *State v. Morris*, 24 S.W.3d 788, 798 (Tenn. 2000) (considering (i)(7) as a single aggravating circumstance when the murder occurred while the defendant was committing first degree murder, rape, burglary, or kidnapping); *State v. Buck*, 670 S.W.2d 600, 608-09 (Tenn. 1984) (holding that the jury charge for the (i)(7) aggravating circumstance should have been limited to rape, robbery, and kidnapping).

In the present case, the State relied upon the (i)(7) aggravating circumstance in that the defendant knowingly committed the victim's murder, while the defendant had a substantial role in committing the kidnapping of the victim. The State also relied upon the (i)(7) aggravating circumstance as a separate aggravator in that the defendant knowingly committed the victim's murder, while the defendant had a substantial role in committing or attempting to commit rape of the victim. The trial court instructed the jury to each as separate aggravating circumstances, and the jury found them as separate aggravating circumstances. The trial court should have instructed the jury on a single (i)(7) aggravating circumstance based upon the multiple felonies of kidnapping and rape. *See Tanzi v. State*, 964 So. 2d 106, 117 (Fla. 2007) (holding that the trial court erred in treating the single felony murder aggravator as multiple and separate aggravators based upon the number of felonies committed). The evidence presented at the trial is sufficient to establish the (i)(7) aggravating circumstance as a single aggravating circumstance. Because the language in subsection (i)(7) does not permit the treatment of this single aggravating circumstance as multiple and separate aggravating circumstances based upon the number of felonies committed, however, the jury's finding of two separate aggravating circumstances under (i)(7) is not supported by the record.

### d. Effect of Errors

We must consider whether the errors affecting the jury's consideration of an invalid aggravating circumstance in a capital sentencing proceeding are harmless beyond a reasonable doubt. *Strouth v. State*, 999 S.W.2d 759, 760 (Tenn. 1999); *see also Rice*, 184 S.W.3d at 678 n.4 ("In this State, the mere submission of an invalid aggravating circumstance to the jury amounts to constitutional error, . . . and that error remains subject to a harmless error analysis."). Specifically, we must consider whether the jury's consideration of the (i)(2) aggravating circumstance and its consideration of the (i)(7) aggravating circumstance as two separate aggravators were harmless beyond a reasonable doubt. The error is harmless beyond a reasonable doubt if "the sentence would have been the same had the jury given no weight to the invalid . . . factor." *State v. Howell*, 868 S.W.2d 238, 262 (Tenn. 1993). However,

> [i]n order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

*Id.* at 260-61.

With regard to the first factor, the number and strength of the remaining valid aggravating circumstances, our supreme court has recognized that "the effect of aggravating circumstances on sentencing usually increases with the number of circumstances proven." *Id.* at 261. However, the qualitative nature, substance and persuasiveness, and quantum of proof supporting the remaining aggravating circumstances is more crucial. *Id.* While the statute does not assign relative importance to the various statutory aggravating circumstances, some aggravating circumstance may be more qualitatively persuasive and objectively reliable by their nature and based upon the proof in certain cases. *Id.*

In the present case, one of the four aggravating circumstances found by the jury is valid, the heinous, atrocious, or cruel aggravating circumstance in section 39-13-204(i)(5). Extensive evidence was presented at trial supporting the especially heinous, atrocious, or cruel aggravating circumstance. *See* Tenn. Code Ann. § 39-13-204(i)(5). The evidence established that the defendant strangled and severely beat the victim. Dr. Funte testified that the cause of the victim's death was strangulation associated with blunt force injuries. Some

of the blunt force injuries were so extensive that they could have caused death in and of themselves. The victim would have been alive when she was strangled, and her head injuries occurred either prior to or at the time of her death. There were abrasions and contusions of the victim's head, skull fractures, hemorrhages in the tissues of the scalp and temporalis muscles on both sides of the head, intracranial bleeding, fracture of the left horn of the hyoid bone, bleeding in the anterior strap muscles of the neck, and hemorrhages in the muscles and soft tissue of the upper chest and in the tissue of the thyroid gland. The victim had contusions and abrasions on her torso and extremities and contusions and bruises on her upper and lower lips, left side of the jaw line and chin, all along her legs, the tops of her feet, and the backs of her hands.

The victim sustained at least four and possibly more blows to her head. She also could have sustained multiple blows to her throat. The injuries on the victim's upper torso and neck area were consistent with being stomped. The victim had a gaping laceration on the right side of her head. She suffered trauma to her chin that likely fractured her skull. Dr. Funte opined that the injury was consistent with the victim being kicked in the chin with either a foot or a knee.

The second factor in the harmless error analysis is the extent to which the prosecutor emphasized the invalid aggravating factor during closing argument. *Howell*, 868 S.W.2d at 261. This factor, however, is not the "prime factor" in determining whether the error was harmless beyond a reasonable doubt. *Id.* In the present case, the prosecutor did not present a closing argument. Moreover, the prosecutor's opening statement was very brief, consisting of only seven pages of transcript. The prosecutor merely summarized the (i)(2) and (i)(7) aggravating circumstances and primarily emphasized the evidence supporting the (i)(5) aggravating circumstance.

The third factor in the harmless error analysis is whether the invalid aggravating circumstance "was established by evidence that was materially inaccurate or admissible only to support the invalid aggravator, or whether the evidence was otherwise admissible in either the guilt or sentencing phases of the proceeding." *Id.* The Tennessee Supreme Court has recognized that "an aggravating factor which duplicates the elements of the underlying crime has less relative tendency to prejudicially effect the sentence imposed than invalid aggravating factors which interject inadmissible evidence in the sentencing calculus, or which require the sentencing jury to draw additional conclusions from the guilt phase evidence." *Id.* The State relied upon evidence that was otherwise admitted during the guilt phase of the trial to support the (i)(7) felony murder aggravating circumstance. The only evidence that the State introduced to support the prior violent felony aggravating circumstance was the certified judgment showing the defendant's prior convictions. The State introduced no evidence regarding the underlying facts and circumstances of those

convictions.

The final factor in the harmless error analysis is the mitigating evidence that was presented during the penalty phase. *Id.* at 262. The mitigating evidence in the present case was extremely limited. The only evidence that the defendant presented in mitigation was the testimony of his mother, who testified that she loved her son and that it would hurt her if the defendant was sentenced to death. The defendant did not present any testimony regarding his childhood, any mental or intellectual limitations, or any good character. Based upon the consideration of these four factors, we conclude that the jury's consideration of the (i)(2) aggravating circumstance and its consideration of the (i)(7) aggravating circumstance as two separate aggravators were harmless beyond a reasonable doubt.

## C. Proportionality Review

When this court conducts the proportionality review required by Tennessee Code Annotated section 39-13-206(c)(1)(D), we do not function as a "super jury" that substitutes our judgment for the judgment of the sentencing jury. *State v. Godsey*, 60 S.W.3d 759, 782 (Tenn. 2001). Rather, we must take a broader perspective than the jurors to determine whether the defendant's sentences are "disproportionate to the sentences imposed for similar crimes and similar defendants." *State v. Thacker*, 164 S.W.3d 208, 232 (Tenn. 2005) (quoting *Bland*, 958 S.W.2d at 664). The pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment possibility of parole, or death." *Rice*, 184 S.W.3d at 679.

The purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the case being analyzed. *State v. Copeland*, 226 S.W.3d 287, 306 (Tenn. 2007). Rather, our task is to "identify and invalidate the aberrant death sentence." *Thacker*, 164 S.W.3d at 233. A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *Carruthers*, 35 S.W.3d at 569. A death sentence is excessive or disproportionate where "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Thacker*, 164 S.W.3d at 233 (quoting *Bland*, 958 S.W.2d at 668).

This court uses "the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes." *Copeland*, 226 S.W.3d at 305 (quoting *State v. Davis*, 141 S.W.3d 600, 619-20 (Tenn. 2004)). We examine "the facts and circumstances of the crime, the characteristics of the

defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002).

In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*State v. Rimmer*, 250 S.W.3d 12, 35 (Tenn. 2008); *see Rollins*, 188 S.W.3d at 575. We also compare the defendant's "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *Rimmer*, 250 S.W.3d at 35; *Rollins*, 188 S.W.3d at 575.

In the present case, the evidence presented at trial established that on June 1, 2010, the defendant kidnapped the victim using a lighter in the shape of a handgun. The defendant forced the victim out into the woods behind her home where he sexually assaulted, beat, strangled, and killed her. Witnesses saw the defendant near the victim's home near the time of her death. The defendant's DNA was found on a gun-shaped lighter and a condom found at the crime scene.

Little personal evidence regarding the defendant was presented during pretrial and at the trial. The defendant's parents divorced when he was young, and he lost contact with his father. In 1993, at the age of fourteen, the defendant was admitted in the adolescent unit at Lakeside Hospital. Dr. John Hutson administered the WISC-III to the defendant, who received a full-scale I.Q. score of 77. Following his release from Lakeside Hospital, the defendant was admitted to Saint Joseph Hospital, a psychiatric hospital in Memphis. He later was transferred from juvenile custody in Tennessee to a boarding school in Pennsylvania. The defendant had not functioned outside of an institutional environment for one year or more at a time since adolescence. Dr. Hutson concluded that the defendant fell within the borderline range of intelligence but was not intellectually disabled.

The defendant asserts that his sentence of death is disproportionate due to his intellectual disability. As we have previously determined, the defendant failed to establish that he is intellectually disabled. Moreover, the death sentence has been upheld even when

the defendant presented evidence regarding mental or intellectual deficiencies. *See, e.g., Middlebrooks*, 995 S.W.2d at 552 (defendant with borderline personality disorder and brain impairment); *State v. Hines*, 919 S.W.2d 573, 584 (Tenn. 1995) (defendant with self-destructive behavior, paranoid personality disorder, dysthymia, and chronic depression); *State v. Shepherd*, 902 S.W.2d 895 (Tenn. 1995) (defendant previously was admitted to a mental health facility); *State v. Smith*, 868 S.W.2d 561, 562 (Tenn. 1993) (defendant had been treated for depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder).

Moreover, the death penalty has been upheld in cases with similar facts and similar aggravating circumstances. *See, e.g., Rice*, 184 S.W.3d at 679 (defendant lured the victim into the woods and raped and stabbed her, (i)(2), (i)(5), and (i)(7) aggravating circumstances); *State v. Cauthern*, 967 S.W.3d 726, 740 (Tenn. 1998) (defendant and co-defendant broke into victim's home and raped and strangled the victim, (i)(5) aggravating circumstance); *State v. Alley*, 776 S.W.2d 506 (Tenn. 1989) (defendant kidnapped the victim and took her to a wooded area where she was beaten, stabbed, strangled, and raped, (i)(5) and (i)(7) aggravating circumstances); *State v. Thompson*, 768 S.W.2d 239 (Tenn. 1989) (female victim was taken to a remote location and stabbed repeatedly, (i)(5), (i)(6), and (i)(7) aggravators.

In completing our review, we need not conclude that this case is exactly like prior cases in every respect, nor must this court determine that this case is "more or less" like other death penalty cases. *State v. Thomas*, 158 S.W.3d 361, 383 (Tenn. 2005). Rather, this court need only identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. The penalty imposed by the jury in the present case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

After review of the record and the applicable law, we affirm the defendant's convictions and sentences.

_____
JOHN EVERETT WILLIAMS, JUDGE